Tyrus D. COLEMAN, Appellant–Defendant,

v.

STATE of Indiana, Appellee–Plaintiff.

No. 20A03–0904–CR–185.

Court of Appeals of Indiana.

March 31, 2010.

Cara Schaefer Wieneke, Wieneke Law Office, LLC, Indianapolis, IN, Attorney for Appellant.

Gregory F. Zoeller, Attorney General of Indiana, Ian McLean, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

KIRSCH, Judge.

Tyrus D. Coleman ("Coleman") was convicted of attempted murder,[1] a Class A felony, after a jury trial. He appeals, raising several issues, of which we find the following dispositive: whether the doctrines of double jeopardy and collateral estoppel barred Coleman's retrial for attempted murder.

We reverse.

### FACTS AND PROCEDURAL HISTORY

Sometime in November 2006, Anthony Dye ("Dye") was robbed by Omar Sharpe ("Sharpe") and another man. During the robbery, the men took money and Dye's gold chain. Because Dye knew that the two men were associated with a recording studio owned by Coleman, he went to Coleman's studio, armed with a handgun

---

1. *See* Ind.Code §§ 35–42–1–1, 35–41–5–1.

for protection, to talk to Coleman about the robbery. Although Coleman did not know about the robbery, he apologized to Dye and offered to find out what he could. Coleman was able to recover Dye's gold chain from Sharpe and called to arrange a time to return it in December. At some point after retrieving the gold chain from Coleman, Dye found out that Coleman had bonded Sharpe out of jail. Dye called Coleman to express his displeasure with this and to tell him that if Dye found out that Coleman had anything to do with the robbery, "there would be problems for [Coleman]," which Coleman understood as a threat to his life. *2008 Tr.*[2] at 274.

In February 2007, Dye's son, Jermaine Jackson ("Jermaine"), heard about the robbery and called Dye to inquire as to why Dye had not told him about it. Dye told Jermaine that he had not mentioned it because he did not want Jermaine to get in any trouble. *Id.* at 128. On March 18, 2007, Dye received a call from Jermaine, who told Dye that Sharpe was located at an apartment complex in Elkhart. Dye told Jermaine, "Don't do nothing. I'm on my way." *Id.* at 130. When Dye was on his way to the apartment complex, Jermaine called back to let Dye know that Sharpe had already left. After going to the shooting range with a friend, Jermaine had the friend drive him to Coleman's recording studio because he said he had "to do something for his dad." *Id.* at 162. When they arrived at the studio, Jermaine saw another friend and asked this friend to go get Sharpe. The friend went inside the studio and told Sharpe that Jermaine wanted to see him. During this time, Jermaine had walked around to the entrance of the studio.

Coleman stepped outside and asked Jermaine what was going on, to which Jermaine replied, "You already know." *Id.* at 280. While Coleman was talking to Jermaine, Sharpe walked outside to see what Jermaine wanted. Within seconds, Jermaine pulled a handgun out of his waistband and pointed it at Sharpe, who ran back into the studio. Jermaine chased Sharpe and a struggle occurred between Jermaine, who was trying to push the studio door open, Sharpe, who was closing the door to prevent Jermaine from entering, and Coleman, who was trying to keep Jermaine from raising the gun at anyone. Eventually, Sharpe and Coleman were able to get the studio closed, leaving Jermaine and Coleman outside. Jermaine returned the handgun to the waistband of his pants.

Coleman continued to attempt to calm Jermaine down and to ask him to leave. Jermaine then began calling people on his cell phone and asking them to come to the studio, despite Coleman's requests not to do so. Jermaine called Dye, who was riding around with his girlfriend, and told Dye to come over to the studio immediately. Although Jermaine did not tell him so, Dye had a "gut feeling" that Sharpe was at the studio. *Id.* at 132. Dye retrieved a handgun from the engine of his car, where he stored it, and had his girlfriend drive him over to Coleman's recording studio. At some point during this time, Coleman retrieved a handgun from inside of the studio, which he held in his hand for the remainder of the confrontation. Coleman also called Jermaine's cousin and friend, Otis Jackson ("Otis"), and asked him to come over to try to calm Jermaine down.

**2.** The record on appeal contains both a two-volume transcript of Coleman's first jury trial, held in February 2008, and a three-volume transcript of the second jury trial, held in March 2009. We will refer to the transcript from the first trial as *2008 Tr.* and the transcript from the second trial as *2009 Tr.*

During this time, Coleman's son had been playing basketball in the front of the house. Coleman told his son to go inside of the studio. The son attempted to leave the studio, and Coleman, motioning with his handgun, ordered the boy back in the studio. When Otis arrived, he tried to get Jermaine to calm down by telling him it "wasn't worth it," that there were kids around, and that he should just leave. *Id.* at 220–21. Coleman also stated that his son was inside of the studio and that Jermaine should respect that. Jermaine replied, "F\*\*k that. [Sharpe] didn't think about that sh\*t when he did this sh\*t to my Daddy." *Id.* at 221. Jermaine also stated that he was going to "beat [Sharpe's] ass" and "pop him." *Id.* at 294.

Shortly thereafter, Dye arrived and entered the backyard area near the studio. Dye held a handgun in his right hand, down at his side, and pointed at the ground. Otis testified that Dye appeared "pretty aggressive" when he walked into the backyard and looked "like he was there to take care of some business." *Id.* at 225–26. When Dye walked toward Jermaine, he saw that Coleman had a gun in his hand and was standing near the studio door. Dye then stated, "F\*\*k all that sh\*t. Where the n\*\*ger at," referring to Sharpe. *Id.* at 135, 223, 295. As Dye came within feet of him, Coleman raised his gun and shot Dye twice. Jermaine then pulled out his handgun and began shooting at Coleman; Coleman turned and shot at Jermaine. The entire exchange of gunfire lasted three seconds. Jermaine died as a result of his injuries. After the shooting, Coleman went back in the studio and had a friend take his son to his grandmother's house. Coleman drove to Milwaukee, disposing of his gun on the way, and stayed for several days before returning and surrendering to the police.

The State charged Coleman with murder for killing Jermaine and attempted murder, a Class A felony, for shooting Dye, who survived his injuries. On February 11–13, 2008, a jury trial was held, at which Coleman argued that he acted in self-defense when he shot Jermaine and Dye. At the conclusion of the trial, the jury found Coleman not guilty as to murder but was unable to reach a verdict as to attempted murder. The trial court set Coleman's attempted murder charge for another trial. On November 10, 2008, Coleman filed a motion to dismiss the attempted murder charge by reason of collateral estoppel. After a hearing, the trial court denied the motion. Coleman was retried on the attempted murder charge on March 16–18, 2009, and the jury found him guilty. He was sentenced to an aggregate sentence of forty-five years. Coleman now appeals.

## DISCUSSION AND DECISION

"Collateral estoppel, or in modern usage, issue preclusion, 'means simply that when an ultimate issue of fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit.'" *Davis v. State*, 691 N.E.2d 1285, 1288 (Ind.Ct.App.1998) (quoting *Ashe v. Swenson*, 397 U.S. 436, 443, 90 S.Ct. 1189, 1194, 25 L.Ed.2d 469 (1970)). In criminal trials, collateral estoppel is an integral part of the protection against double jeopardy guaranteed by the Fifth and Fourteenth Amendments. *Id.* (citing *Townsend v. State*, 632 N.E.2d 727, 731 (Ind.1994)). It is not the same as double jeopardy, but rather it is embodied within the protection against double jeopardy. *Segovia v. State*, 666 N.E.2d 105, 107 (Ind. Ct.App.1996). " 'The traditional bar of jeopardy prohibits the prosecution of the crime itself, whereas collateral estoppel, in a more modest fashion, simply forbids the

government from relitigating certain facts in order to establish the fact of the crime.'" *Davis,* 691 N.E.2d at 1288 (quoting *Segovia,* 666 N.E.2d at 107) (internal quotation omitted). Thus, collateral estoppel requires that when the State has received an adverse decision of a critical issue of fact in a trial, that adverse decision prevents later re-litigation of the same issue in a later prosecution. *Id.*

Coleman argues that the doctrine of issue preclusion barred the State from re-litigating the issue of whether his use of force against Dye was criminal. He contends that the jury's acquittal for the murder of Jermaine in his first trial "could not have been for any other reason than a finding that Coleman acted in self-defense and/or defense of another" because, during the trial, he did not deny shooting Jermaine but only argued that he was justified in doing so. *Appellant's Br.* at 12. Therefore, Coleman asserts that the jury's determination meant that the jury also necessarily decided that his use of force against Dye, which immediately preceded his use of force against Jermaine, was not criminal.

■ "In order to apply the doctrine of collateral estoppel, the court must engage in a two-step analysis: '(1) determine what the first judgment decided; and (2) examine how that determination bears on the second case.'" *Segovia,* 666 N.E.2d at 107 (quoting *Webb v. State,* 453 N.E.2d 180, 183 (Ind.1983) (citations omitted)). In order to determine what the first judgment decided, the court must examine the record of the prior proceedings including the pleadings, evidence, charge, and any other relevant matter. *Id.* The court must then decide whether a reasonable jury could have based its verdict upon any factor other than the factor of which the defendant seeks to foreclose consideration. *Id.* If the jury could have based its decision on

another factor, then collateral estoppel does not bar re-litigation. *Id.*

■ In the present case, Coleman was initially charged with murder for killing Jermaine and attempted murder for shooting Dye. In the first trial, the jury found Coleman not guilty as to the murder of Jermaine, determining that Coleman acted in self-defense when he shot Jermaine. The jury was unable to reach a verdict as to the attempted murder charge concerning the shooting of Dye. "A person is justified in using reasonable force against another person to protect the person or a third person from what the person reasonably believes to be the imminent use of unlawful force." Ind.Code § 35–41–3–2. In order to prevail on such a claim, the defendant must show that he: (1) was in a place where he had a right to be; (2) did not provoke, instigate, or participate willingly in the violence; and (3) had a reasonable fear of death or great bodily harm. *Kimbrough v. State,* 911 N.E.2d 621, 635 (Ind.Ct.App.2009). Here, the jury was instructed as follows as to the justification of self-defense:

> It is an issue whether the Defendant acted in self-defense.
>
> A person may use reasonable force against another person to protect himself or a third person from what he reasonably believes to be the imminent use of unlawful force.
>
> A person is justified in using deadly force, and does not have a duty to retreat, only if he reasonably believes that deadly force is necessary to prevent serious bodily injury to himself or a third person or the commission of a forcible felony.
>
> However, a person may not use force if:
> He is committing a crime that is directly and immediately connected to the confrontation;

He provokes a fight with another person with intent to cause bodily injury to that person; or

He has willingly entered into a fight with another person or started the fight, unless he withdraws from the fight and communicates to the other person his intent to withdraw and the other person nevertheless continues or threatens to continue the fight.

The State has the burden of proving beyond a reasonable doubt that the defendant did not act in self-defense.

*Appellant's App.* at 112.

In order to acquit Coleman of murder based upon self-defense, the jury must have determined that Coleman reasonably believed that deadly force was necessary to prevent serious bodily injury to himself or third persons or the commission of a forcible felony. Because of this determination, the jury necessarily had to find that, when he shot Jermaine, Coleman was not committing a crime that was directly and immediately connected to the confrontation, that he did not provoke a fight with another person with the intent to cause bodily injury to that person, and that he had not willingly entered into a fight with another person. As the shootings of Dye and Jermaine happened within three seconds of each other, the jury's determination must have meant that Coleman had not willingly entered into a fight with Dye, that he had not provoked a fight with Dye with the intent to cause bodily injury to Dye, and that he was not committing a crime that was directly and immediately connected to the confrontation. Stated another way, the jury must have believed that Coleman was in a place that he had a right to be; that he did not provoke, instigate, or participate willingly in the violence; and that he had a reasonable fear of death or great bodily harm. *See Kimbrough,* 911 N.E.2d at 635. Therefore, in acquitting Coleman of murdering Jermaine based upon self-defense in the first trial, the jury must have necessarily decided that Coleman's use of force against Dye was also not a crime. If Coleman's use of force against Dye was a crime, then the jury could not have reasonably determined, pursuant to the final instructions given, that Coleman's use of force against Jermaine was justified. Thus, the doctrine of issue preclusion barred the State from re-litigating the issue of whether Coleman's actions against Dye constituted attempted murder. The trial court should not have denied Coleman's motion to dismiss.

Reversed.

MAY, J., concurs.

DARDEN, J., dissents with separate opinion.

DARDEN, Judge, dissenting.

I would respectfully dissent from the majority.

The facts, as recounted by the majority, arguably could support their conclusion that the jury could not have reasonably disbelieved that Coleman's use of deadly force was necessary. On the other hand, however, I believe that the totality of the evidence and circumstances surrounding this case support the reasonable conclusion that the jury just could not reach a unanimous verdict as to whether Coleman was justified in using deadly force against Dye at the time of the incident. As a result, I believe the majority's conclusion impermissibly impinges upon the jury's role as the trier of fact.

This case represents a relatively rare moment where the entire incident was preserved for the trier of fact, *i.e.,* the jury, to decide what happened. Specifically, the activity in the yard next to the studio

before the shooting and during the shooting of Dye by Coleman was captured on video by a surveillance camera. This video was shown to the jury. The area shown may be described as an upside-down "L"— with the horizontal leg parallel to the back of a house; the vertical leg on the right, parallel to the studio.

For at least five minutes before Dye's arrival, Coleman is pacing alongside the studio with a handgun in one hand and a cell phone in his other, apparently talking on the cell phone.[3] Jermaine is in the area primarily beyond the view of the camera, but at the end of the vertical leg past the studio. From the opposite end of this "L" (at the left end of the horizontal leg), Dye is seen coming around the corner of the house; he has a gun in his hand but it is pointed downward toward the ground. Dye walks on the diagonal directly toward his son, with his eyes fixed upon his son. Dye is not walking toward the door of the studio; nor does he appear to be looking at Coleman. At this point in time, Coleman is near the right angle corner of the "L."[4] As Dye moves diagonally past him, Coleman appears to step toward Dye, raise his gun, and shoot Dye, who immediately begins to fall to the ground. Coleman shoots Dye a second time.[5] It is at this point that Coleman "turned to Jermaine." (Tr. 330). Coleman sees that Jermaine's gun, which had been under his long athletic-type shirt and in its holster, is "pointed at [Coleman]"; and Coleman shoots Jermaine. (Tr. 330).

Consistent with the video, Dye testified that as he walked across the yard, his "focus" was on "[his] son," and that he was going "towards [his] son." (Tr. 135). He

further testified that he "asked" his son, "where that n**ger at or where Omar at." *Id.* Coleman also testified that when Dye walked into the yard, he was "looking at" his son, and "was not looking at [Coleman]" when he said, "F**k that. Where the n**ger at?' " (Tr. 327).

A defendant who raises the claim of self-defense must show three facts: "(1) he was in a place where he had a right to be; (2) he acted without fault; and (3) he had a reasonable fear of death or great bodily harm." *Wallace v. State*, 725 N.E.2d 837, 840 (Ind.2000). It is the State's burden to negate "at least one of the elements of the defendant's self-defense claim." *Id.*

I believe that the evidence must be considered sequentially and separately as to each count—first, the evidence as to shooting of Dye, and then the separate evidence as to the shooting of Jermaine. After reviewing the video that the jury saw, I am of the opinion that the testimony at trial and the video evidence could support the reasonable inference that Coleman *was not* in fear for his life as Dye was walking past him, while also supporting the reasonable inference that Coleman *was* in fear for his life when facing Jermaine's drawn weapon. Such analysis supports my conclusion that we simply cannot know what determination the jury reached, or failed to reach.

Because a "jury's deliberations are secret and not subject to outside examination," *Yeager v. United States*, —— U.S. ——, 129 S.Ct. 2360, 2368, 174 L.Ed.2d 78 (2009), we cannot know why the first jury was unable to reach a unanimous verdict on the attempted murder of Dye. It may be that one of the twelve jurors believed that the State had failed to negate Cole-

---

3. Coleman testified that he had placed calls to several people during this time.

4. It seems undisputed that Jermaine's gun is holstered at this time.

5. Coleman admitted that he fired the second shot at Dye "as he was going to the ground." (Tr. 308, 329).

man's claim of self-defense as to Dye; but it may also be that there were eleven jurors who believed that the State *had* negated Coleman's claim of self-defense; and, as a result, the jury could not arrive at a unanimous verdict for conviction, as required by law. In other words, the jury hung as to the charge of attempted murder, requiring a mistrial and resulting retrial on that count. Accordingly, I cannot agree with the majority's conclusion that issue preclusion applies here, and I would conclude that the trial court did not abuse its discretion when it allowed Coleman to be re-tried for the attempted murder of Dye.