ATTORNEY FOR APPELLANT
Cara Schaefer Wieneke
Wieneke Law Office, LLC
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE
Gregory F. Zoeller
Attorney General of Indiana

Ian McLean
Deputy Attorney General
Indianapolis, Indiana



FILED
May 18 2011, 9:54 am

CLERK
of the supreme court,
court of appeals and
tax court

# In the
# Indiana Supreme Court

No. 20S03-1008-CR-458

TYRUS D. COLEMAN,

*Appellant (Defendant below),*

v.

STATE OF INDIANA,

*Appellee (Plaintiff below).*

Appeal from the Elkhart Circuit Court, No. 20C01-0703-MR-1
The Honorable Terry C. Shewmaker, Judge

On Petition To Transfer from the Indiana Court of Appeals, No. 20A03-0904-CR-185

**May 18, 2011**

**Rucker, Justice.**

In this opinion we discuss among other things whether the Double Jeopardy Clause of the United States Constitution precludes the State from retrying a defendant where in the first trial the jury acquitted the defendant of murder with respect to one victim but failed to return a verdict on a charge of attempted murder with respect to another victim. We conclude it does not.

**Facts and Procedural History**

In a tragic incident occurring March 18, 2007, Tyrus Coleman shot his friends Anthony Dye and Dye's son Jermaine Jackson during a confrontation on Coleman's property, where Coleman operated a music recording studio. The confrontation stemmed from an event occurring approximately four months earlier in which Omar Sharpe, one of Coleman's musician clients, robbed Dye at gunpoint. Coleman retrieved part of the stolen property from Sharpe and returned it to Dye. Jermaine[1] was irritated when he later learned that Sharpe had robbed his father, but Dye asked him not to get involved. On the afternoon of the shootings, Jermaine discovered that Sharpe was present at Coleman's studio and frantically phoned Dye to "[c]ome over here right now." Tr. 1 at 131.[2] Armed with a handgun Dye headed to Coleman's studio. In the meantime an armed and agitated Jermaine pushed open the door to the studio and attempted to enter. Sharpe, who was present inside, prevented Jermaine's entry and closed the door. Exiting the studio Coleman attempted to calm Jermaine and to dissuade him from trying to enter. Coleman called a neighbor to come over to help calm Jermaine; he also called his business partner to inform him of the situation. The neighbor testified that he tried to talk with Jermaine by telling him what he [Jermaine] was doing "wasn't worth it. Just go ahead and leave. There was kids around and people around that didn't have nothing to do with what they was angry about." Tr. 1 at 220-21. According to the witness Jermaine responded by saying, "F**k that. He didn't think about that s**t when he did the s**t to my Daddy." Tr. 1 at 221. Coleman armed himself, Tr. 1 at 286, and walked back and forth in front of the studio door holding his

---

[1] For the sake of consistency with the parties' briefs, we refer to Jermaine Jackson by first name and the other actors by last name.

[2] We cite the transcript from Coleman's first trial as "Tr. 1" and the transcript from his second trial as "Tr. 2."

handgun at his side.  State's Ex. 25 at 03:32:20.[3]  As Coleman was making a phone call, Dye came into the yard through a front gate carrying a handgun which was pointed toward the ground.  Dye strode toward his son Jermaine, who was standing next to Coleman on the patio in front of the studio.  Within three seconds, the following occurred:  Dye stepped onto the patio where Jermaine and Coleman were standing.  As Dye stepped in front of Coleman, Coleman raised his gun and fired at Dye, who immediately fell to the ground.  Coleman then shot Dye a second time.  At that point Coleman "turned to Jermaine."  Tr. 1 at 330.  Coleman saw that Jermaine's handgun, which before that time had been concealed under his shirt and in a holster, was "pointed at [Coleman]," Tr. 1 at 330; and Coleman shot Jermaine.  Jermaine fell to the ground, State's Ex. 25 at 03:35:33-03:35:36, and died at the scene as a result of his injuries.  After the shooting, Coleman drove to Milwaukee disposing of his weapon along the way.  Several days later he returned to Elkhart and surrendered to the police.

The State charged Coleman with murder, a felony, for the death of Jermaine and attempted murder, a Class A felony, for shooting Dye.  During a jury trial conducted in February 2008 Coleman testified and admitted the shootings, but contended that his actions against both Jermaine and Dye were justified on the basis of self-defense.  The jury returned a verdict of not guilty on the murder charge, but was unable to reach a verdict on the attempted murder charge.  The trial court thus declared a mistrial on that count and scheduled another trial.  Prior to retrial Coleman filed a motion to dismiss contending a subsequent trial on attempted murder was barred by collateral estoppel and would therefore violate the Double Jeopardy Clauses of both the United States and Indiana Constitutions.  See Appellant's App. at 147.  After a hearing, the trial court denied the motion.  A retrial ensued, at the conclusion of which the jury found Coleman guilty as charged.  Thereafter the trial court sentenced him to a term of forty-five years.  Coleman appealed raising several issues for review.  In a divided opinion the Court of Appeals reversed Coleman's conviction on grounds of collateral estoppel.  Coleman v. State, 924 N.E.2d 659 (Ind. Ct. App. 2010).  Having previously granted transfer thereby vacating the opinion of the

---

[3] As part of the recording studio's security system, video cameras were present in the vicinity of the studio.  Tr. 1 at 187.  The security system recorded the events of the day onto DVDs, which were admitted into evidence as State's Exhibits 25 and 34.  We reference State's Exhibit 25 in hours, minutes, and seconds as time-stamped on the video recording.

Court of Appeals, see Ind. Appellate Rule 58(A), we now affirm Coleman's conviction. Additional facts are set forth below where necessary.

## Discussion

## I.

## Collateral Estoppel

The Double Jeopardy Clause contained in the Fifth Amendment to the United States Constitution provides, "[N]or shall any person be subject for the same offense to be twice put in jeopardy of life or limb."[4] Collateral estoppel (also referred to as issue preclusion) has been characterized as an "awkward phrase" however "it stands for an extremely important principle in our adversary system of justice. It means simply that when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit." Ashe v. Swenson, 397 U.S. 436, 443 (1970). Collateral estoppel is not the same as double jeopardy, but rather it is embodied within the protection against double jeopardy. "'[T]he traditional bar of jeopardy prohibits the prosecution of the crime itself, whereas collateral estoppel, in a more modest fashion, simply forbids the government from relitigating certain facts in order to establish the fact of the crime.'" Little v. State, 501 N.E.2d 412, 414 (Ind. 1986) (quoting United States v. Mock, 604 F.2d 341, 343-44 (5th Cir. 1979)). In essence the doctrine of collateral estoppel "precludes the Government from relitigating any issue that was necessarily decided by a jury's acquittal in a prior trial." Yeager v. United States, ___U.S.___, ___, 129 S. Ct. 2360, 2366 (2009). To decipher what a jury necessarily decided in a prior trial, courts should "examine the record of a prior proceeding, taking into account the pleadings, evidence, charge, and other relevant matter, and conclude whether a rational jury could have grounded its verdict upon an issue other than that which the defendant seeks to foreclose from consideration." Id. at 2367 (quoting Ashe, 397 U.S. at 444).

---

[4] A similarly worded provision of the Indiana Constitution provides, "No person shall be put in jeopardy twice for the same offense." Ind. Const. art. 1, § 14. Although Coleman cites Article 1 section 14, he advances no argument concerning the Indiana Constitution. We thus address the Double Jeopardy claim under the Federal Constitution only.

Coleman contends the trial court erred in denying his motion to dismiss the attempted murder charge following the first trial. He argues the second trial violated his protection against double jeopardy by allowing the State to relitigate an issue already definitively decided in the first trial, namely, that he acted in self-defense when shooting Dye. According to Coleman, "the jury's acquittal of Coleman on the murder charge could only have been based on its determination that Coleman acted in defense of himself and/or another person." Br. of Appellant at 16.

A valid claim of self-defense is legal justification for an otherwise criminal act. Randolph v. State, 755 N.E.2d 572, 575 (Ind. 2001). In order to prevail on a claim of self-defense a defendant must show: (1) he was in a place where he had a right to be; (2) he acted without fault; and (3) he had a reasonable fear of death or great bodily harm. Id. at 576; see also Ind. Code § 35-41-3-2. Here, Coleman seems to contend that because of the brief interval between the two shootings, they necessarily amounted to a single transaction. Thus, the conclusion is that Coleman's general fear of death or great bodily harm applied equally to Jermaine and Dye. This argument is unavailing. To begin, Coleman was charged separately with the murder of Jermaine and the attempted murder of Dye. See Appellant's App. at 17. It is true that in the first trial, the trial court did not instruct the jury on the elements of self-defense separately with respect to each victim. See Appellant's App. at 112. However, during summation Coleman's counsel specifically addressed the separate shootings and argued each was justified by Coleman's reasonable imminent fear of death or serious bodily injury from Dye, and then from Jermaine. See Tr. 1 at 378, 382-83, 388, 390-94.

Further, for the sake of argument we accept as true that the jury's acquittal of Coleman on the murder charge in the first trial was based on its belief that Coleman acted in self-defense. But, the jury could have rationally concluded that the act of self-defense was in response to the conduct of Jermaine only. The jury was not bound to believe that Coleman likewise acted in self-defense with respect to Dye. Stated differently, the jury could very well have determined that Jermaine so threatened Coleman and others on the property that he was justified in using deadly force to protect himself and others from Jermaine. The record shows for example that an armed and agitated Jermaine had attempted to gain access to the studio in pursuit of Sharpe, and

5

that although Coleman fired his weapon first at Dye, it was only Jermaine and not Dye who actually pointed his own weapon at Coleman. And there was testimony that Jermaine fired his weapon in Coleman's direction. Tr. 1 at 208, 300-02. Coleman responded by firing at Jermaine resulting in fatal injury. In essence the acquittal relating to the murder of Jermaine even if based on self-defense did not amount to the jury determining that Coleman acted in self-defense with respect to the attempted murder of Dye. Thus, in retrying Coleman the State did not relitigate an issue that was necessarily decided by the jury in the first trial. Instead, the jury was asked to make the determination of whether Coleman acted in self-defense when he shot Dye. This issue was not decided during the first trial. Thus, collateral estoppel did not bar relitigation. And the trial court correctly denied Coleman's motion to dismiss. Because the Court of Appeals reversed the judgment of the trial court on this issue, it did not address Coleman's remaining claims. We do so now.

## II.
### Prosecutorial Misconduct

Coleman contends the State engaged in prosecutorial misconduct by (i) presenting false testimony that the State knew to be false, and (ii) further using the false testimony to the State's advantage during closing argument. The essential facts are these. During the first trial, Dye testified that upon entering Coleman's backyard he "asked [Jermaine] where [Sharpe] was at" and he "might" have done so using foul and offensive language, specifically "where that n****r at[?]" Tr. 1 at 135. During the second trial, Dye responded "No" when the prosecutor asked, "Did you say anything to [Coleman]?" Tr. 2 at 146. On cross-examination Coleman's counsel asked Dye if he had said "anything to anybody" [including Jermaine] as he walked into the backyard, to which Dye responded "No." Tr. 2 at 156. Coleman's counsel made no effort to confront Dye with his inconsistent statement from the first trial, and the prosecutor did not point out the inconsistency. In his closing argument the prosecutor highlighted Coleman's own statement given to police in which he said that "[Dye] didn't say anything" when he entered the yard, as well as Dye's trial testimony to that effect. Tr. 2 at 535-36.

6

Coleman does not identify any objection presented at trial to the asserted prosecutorial misconduct and concedes "[u]nfortunately, the claim has not been properly preserved in this case . . . ." Br. of Appellant at 24. See Johnson v. State, 725 N.E.2d 864, 867 (Ind. 2000) (declaring that a party's failure to present a contemporaneous trial objection asserting prosecutorial misconduct results in waiver of appellate review).

If a defendant properly raises and preserves the issue of prosecutorial misconduct, then the reviewing court determines (1) whether the prosecutor engaged in misconduct, and if so, (2) whether the misconduct, under all of the circumstances, placed the defendant in a position of grave peril to which he or she would not have been subjected. Baer v. State, 866 N.E.2d 752, 756 (Ind. 2007). Where a claim of prosecutorial misconduct has not been properly preserved, our standard for review is different from that of a properly preserved claim. More specifically, the defendant must establish not only the grounds for the misconduct but also the additional grounds for fundamental error. Cooper v. State, 854 N.E.2d 831, 835 (Ind. 2006). Fundamental error is an extremely narrow exception that allows a defendant to avoid waiver of an issue. It is error that makes "a fair trial impossible or constitute[s] clearly blatant violations of basic and elementary principles of due process . . . present[ing] an undeniable and substantial potential for harm." Benson v. State, 762 N.E.2d 748, 756 (Ind. 2002).

In this case we do not reach the question of fundamental error because we conclude Coleman has not carried his burden of demonstrating misconduct. It is of course true that "[t]he prosecution may not stand mute while testimony known to be false is received into evidence. False evidence, when it appears, must not go uncorrected." Sigler v. State, 700 N.E.2d 809, 813 (Ind. Ct. App. 1998) (internal citation omitted). But the fact of contradictory or inconsistent testimony does not mean the testimony is false. See Timberlake v. State, 690 N.E.2d 243, 253 (Ind. 1997) ("While the knowing use of perjured testimony may constitute prosecutorial misconduct, contradictory or inconsistent testimony by a witness does not constitute perjury."). Dye's testimony during retrial that he said nothing when entering Coleman's yard is at most inconsistent with his testimony during the first trial. To refer to the statement as false is mere hyperbole. The contradictory statement was elicited by Coleman's counsel on cross-examination. However, for reasons not clear from the record before us Coleman's counsel did

not capitalize on this opportunity by confronting Dye with this apparent inconsistency. When the State then referred to Dye's testimony in its closing argument, it first highlighted Coleman's own statement to police that Dye had said nothing. This was fair comment on the evidence. These acts do not rise to the level of prosecutorial misconduct. Coleman's claim on this issue therefore fails.

## III.
### Exclusion of Evidence

Coleman next contends the trial court erred by excluding the introduction of certain evidence. According to Coleman not only was most of the evidence admitted during the first trial, but also the evidence was presented by the State in its case-in-chief during the first trial. He argues, "[o]n retrial, however, the State chose not to present the evidence and even objected to its use by the defense." Br. of Appellant at 28.[5] Specifically Coleman refers to statements made by Dye during the first trial and statements attributable to Jermaine that were introduced into evidence during the first trial. Coleman also asserts error in the trial court's refusal to allow evidence that he was acquitted of Jermaine's murder.

*A.      Statements made by Dye*

As discussed in Part II above, during the first trial Dye testified that upon entering Coleman's backyard he "asked [Jermaine] where [Sharpe] was at" and he "might" have done so using offensive language. Tr. 1 at 135. On retrial, the trial court permitted Coleman to testify to the exact words Dye uttered. However, sustaining the State's hearsay objection, the trial court prohibited three defense witnesses from so testifying. Instead, the trial court allowed the witnesses to testify that Dye said "something" as he entered the yard. Coleman claims error.

---

[5] Other than complaining that "[t]he retrial jury was presented with a very different case than the first jury," Br. of Appellant at 27, Coleman makes no claim of error in this regard and we find none. The fact of the matter is that the second trial was necessarily different. In the first trial Coleman was faced with two separate charges against two separate alleged victims. And the evidence concerning these charges was overlapping. By contrast, in the second trial there was only one charge against one alleged victim. The State thus structured its presentation of the evidence to reflect this reality.

Hearsay is an out-of-court statement offered in court to prove the truth of the matter asserted. Ind. Evidence Rule 801(c); Garner v. State, 777 N.E.2d 721, 724 (Ind. 2002). Coleman contends the witnesses' statements were not hearsay because they were not offered for their truthfulness. Instead, according to Coleman, the statements were offered to show that he was in fear of his life or the lives of others on his property and thus the statements supported his claim of self-defense.

This Court has held "[w]hen a claim of self-defense is interposed, any fact which reasonably would place a person in fear or apprehension of death or great bodily injury is admissible." Hirsch v. State, 697 N.E.2d 37, 40 (Ind. 1998) (internal quotation marks omitted). Thus if Dye's words could reasonably be interpreted as placing Coleman in fear or apprehension of death or great bodily harm, then they were relevant and admissible without regard to their truthfulness. The problem here however is nowhere does Coleman contend that the words uttered by Dye placed Coleman in such fear or apprehension. Although Coleman testified to the precise language used, he did not elaborate on or express any particular concern about the utterances. Instead the focus of Coleman's self-defense claim was on Dye's overall demeanor, and the fact that Dye was armed. Coleman testified for example that he believed "[Dye] was going to come kill us." Tr. 2 at 399. He also testified, "I thought [Dye] was shooting back at me," Tr. 2 at 399, and that "I felt [Dye] was coming to shoot Omar, me too." Tr. 2 at 402. There was testimony from other witnesses that Dye spoke "loudly" and he appeared as if he was "on a mission" and was "angry." Tr. 2 at 348, 457. There is simply nothing in the record before us indicating that the proffered statements Dye made were of any particular concern to Coleman or others. Thus, even if Dye's exact words were not offered for their truthfulness and thus were not hearsay, they were not relevant or admissible, at least through the testimony of third party witnesses. And this is so because Coleman failed to demonstrate the words placed him or others in fear or apprehension of great bodily harm. Accordingly, although the trial court erred in excluding the evidence on grounds of hearsay, the error was harmless because the evidence was excludable on grounds of relevance. See Lashbrook v. State, 762 N.E.2d 756, 758 (Ind. 2002) ("[A]ppellate review of the exclusion of evidence is not limited to the grounds stated at trial, but rather the ruling will be upheld if supported by any valid basis.").

*B.*     *Statements attributable to Jermaine*

Coleman complains that during trial he "attempted to present testimony from Yarrum Murray, Willie Williams, and Otis Jackson about statements that Jermaine made that day [the day of the shootings] in the backyard, but the trial court excluded the evidence." Br. of Appellant at 31. Essentially, the purported testimony would have shown that on the day of the shootings Jermaine made statements demonstrating that he was angry, agitated, and upset. The trial court excluded the testimony on grounds of hearsay and noted that Jermaine was no longer available for cross-examination to test the validity of the witnesses' accounts. Similar to his claim concerning Dye's excluded statement, Coleman contends that Jermaine's statements were not hearsay because they were not offered for their truthfulness. Instead, according to Coleman, the statements were offered to show that he was in fear for his life or the lives of others on his property and thus the statements supported his claim of self-defense. In the alternative Coleman argues that even if hearsay the statements were nonetheless admissible under Indiana Evidence Rule 803(3) to show Jermaine's then existing state of mind. We have a much different view.

Coleman's fear for his life or the lives of others on the basis of Jermaine's statements has no relevance to his self-defense claim with respect to Dye. Stated differently, even if it is true that Jermaine's statements placed Coleman in fear of death and great bodily harm, at most that fact may have supported Coleman's justification for fatally shooting Jermaine. Coleman does not explain, nor can we discern, how his fear of Jermaine transferred to a fear of Dye. Coleman contends for example that Yarrum Murray planned to testify that he drove Jermaine to the studio on the day of the shooting and that Jermaine was upset and repeatedly yelled for Sharpe to come out of the studio. Br. of Appellant at 31. According to Coleman, Willie Williams intended to testify that Jermaine called him on the day of the shooting and asked Williams to come to the studio, and that when he arrived, Williams asked Jermaine what was going on and Jermaine replied that Sharpe was inside the studio. Br. of Appellant at 32. Finally, according to Coleman, Otis Jackson intended to testify that he spoke to Jermaine in the backyard on the day of the shooting and told Jermaine "it wasn't worth it," that children were in the area, and that an agitated Jermaine responded "f**k that. [Sharpe] didn't think about that s**t when he did this s**t" to Dye. Br. of Appellant at 32 (quoting Tr. 1 at 220-21).

Assuming for the sake of argument the foregoing statements placed Coleman in fear of Jermaine, there is simply nothing contained in the statements suggesting they placed Coleman in fear of Dye.[6]  The trial court did not err by excluding the testimony.

*C.*     *Evidence of Acquittal*

Coleman contends the trial court erred by not permitting him to introduce evidence that he was acquitted in the shooting death of Jermaine.  Coleman insists, "[t]he portion of the surveillance video played for the jury showed Coleman turn and shoot several times at Jermaine, for no apparent reason, after shooting Dye.  The trial court refused to allow Coleman to tell the jury about his prior acquittal."  Reply Br. of Appellant at 7 (internal citation omitted).

To support his claim of error Coleman cites Hare v. State, 467 N.E.2d 7 (Ind. 1984).  In that case the defendant Hare was accused of robbing a Shelbyville pharmacy.  Over the defendant's objection the trial court admitted the testimony of a pharmacist who said the defendant had robbed his Terre Haute store within a week of the Shelbyville robbery.  The two robberies were similar in several respects, but the defendant had been acquitted of the Terre Haute robbery.  Although acknowledging the rule that evidence of criminal conduct other than that charged generally is inadmissible, we declared "[e]vidence of a crime other than that charged is . . . admissible to show intent, motive, purpose, identity, or common scheme or plan" and that the defendant's acquittal of the charge was also admissible as it affected the weight of the evidence and not its admissibility.  Id. at 18.

Hare provides Coleman no refuge.  The essential facts in this case are these.  The State intended to show the video of the entire shooting incident that included the shooting of both Dye and Jermaine.  Coleman had no objection but argued that he should be allowed to present evidence that he was previously charged and acquitted in the shooting death of Jermaine.  The trial court rejected his argument.  However, for reasons not entirely clear from the record before

---

[6] Though it is not the case here, we note that in some circumstances third party threats directed at a defendant might well be admissible in order to support a claim of self-defense.  See Andre M. Solé, Annotation, Admissibility of Threats to Defendant Made by Third Parties to Support Claim of Self-Defense in Criminal Prosecution for Assault or Homicide, 55 A.L.R.5th 449 (1998).

us, the shooting of Jermaine was not visible when the video was played to the jury.[7]  In fact the trial court asked counsel for Coleman, "Do you want to put on evidence that your client shot Mr. Dye and then turned towards Mr. Jermaine Jackson and started shooting him?  Is that what you want to do?"  Tr. 2 at 450.  To which counsel responded, "I don't want to put on evidence that my client shot Jermaine.  I want to put on evidence as to why my client turned towards him, and also because this is very relevant to our theory of the case that Tyrus Coleman was facing two armed men, both of whom were dangerous."  Tr. 2 at 450.

Here, despite Coleman's claim to the contrary the video did not reveal that Coleman shot Jermaine.  And counsel declined the trial court's invitation to introduce such evidence.  In the absence of any evidence revealing a crime against Jermaine, Coleman was not entitled to introduce evidence of his acquittal of a crime.  The trial court thus committed no error on this issue.

## IV.
### Review of Sentence

For his final claim Coleman seeks revision of his sentence.  Article 7, section 4 of the Indiana Constitution provides "[t]he Supreme Court shall have, in all appeals of criminal cases, the power to . . . review and revise the sentence imposed."  Our rules authorize revision of a sentence "if, after due consideration of the trial court's decision, the Court finds that the sentence is inappropriate in light of the nature of the offense and the character of the offender."  App. Rule 7(B).

Although citing Rule 7(B), Coleman tells us nothing about the nature of the offense other than to press his argument that he acted in self-defense.  As for his character Coleman points to the numerous letters sent to the trial court attesting to his good character and his willingness to

---

[7] Indeed on at least two occasions during the course of trial, responding to Coleman's persistent argument that the video showed Coleman shooting Jermaine, the trial court observed: "The part that was shown to the jury did not show him shooting Jermaine in spite of what you say.  It did not show that."  Tr. 2 at 382.  "Well, now, you keep saying that, but that does not appear in the video.  The evidence speaks for itself."  Tr. 2 at 449.  There was speculation that the failure of the video to show Jermaine's shooting was the result of the compression ratio of the courtroom video screen.  Tr. 2 at 262-63.

help others. "[A] defendant must persuade the appellate court that his or her sentence has met [the] inappropriateness standard of review." Childress v. State, 848 N.E.2d 1073, 1080 (Ind. 2006). Coleman has failed in this effort.

Concerning the nature of the offense, the advisory sentence is the starting point the Legislature has selected as an appropriate sentence for the crime committed. The advisory sentence for a Class A felony is thirty years. See I.C. § 35-50-2-4. Here the trial court imposed a sentence of forty-five years. Although the nature of the offense may justify a revised sentence under some circumstances, we are not persuaded those circumstances are present in this case. The record shows that Coleman fired at Dye twice at close range with a .45 caliber handgun. The first shot struck Dye in the head. After Dye was immobilized and fell to the ground, Coleman fired again striking Dye in the chest. Further, although Coleman had the opportunity to do so, he never used his cell phone to contact the police and inform them that two armed and dangerous men were on his property. In addition, there were a number of other adults in the immediate area as well as small children, including Coleman's own son, whose safety was put in jeopardy by Coleman firing his weapon. Regarding the character of the offender, the record shows that Coleman has amassed a criminal record that includes six misdemeanor offenses and one felony offense. Coleman was also on probation at the time of the instant offense. We have not been persuaded that Coleman's character or the nature of his offense requires a revision of Coleman's sentence.

**Conclusion**

We affirm the judgment of the trial court.

Shepard, C.J., and Dickson, Sullivan and David, JJ., concur.