**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



FILED

Dec 28 2012, 9:13 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**ZACHARY A. WITTE**
Fort Wayne, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**MICHAEL GENE WORDEN**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| MANUEL J. SILVA, | ) |
| | ) |
| Appellant-Defendant, | ) |
| | ) |
| vs. | ) No. 02A03-1204-CR-190 |
| | ) |
| STATE OF INDIANA, | ) |
| | ) |
| Appellee-Plaintiff. | ) |

APPEAL FROM THE ALLEN SUPERIOR COURT
The Honorable John F. Surbeck, Jr., Judge
Cause No. 02D05-1106-MR-6

**December 28, 2012**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**VAIDIK, Judge**

**Case Summary**

Manuel J. Silva was convicted by a jury of murder for beating a man to death with a baseball bat and now appeals contending that the State failed to rebut his claim of self-defense. We conclude that the evidence is sufficient to rebut Silva's self-defense claim and therefore affirm.

**Facts and Procedural History**

The facts most favorable to the verdict reveal that on the night of May 24, 2011, Jacob Kole, Michael McDaniel, Christopher Deaton, James Hess, Tamara Ghaster, Destiny Kumfer, Destiny's infant daughter, and Eddie Bennett were watching a Chicago Bulls basketball game at 420 Bass Street in Fort Wayne, Indiana. Angel Silva sometimes stayed at the house but was not there on this occasion.

Christopher, who was deaf, received a monthly disability check and was very "generous" with his money. Tr. p. 96. Christopher had texted Angel earlier in the day accusing her of stealing some of his money. Around 10:30 or 11:00 p.m., Destiny received a text message from Angel telling her to leave the house. *Id.* at 131. Destiny, her daughter, and Eddie went outside the house to try and decipher Angel's cryptic message.

At about the same time, a truck carrying Angel, Angel's father Silva, Angel's mother Elizabeth Carter, Angel's boyfriend, and Alfred Gomez passed by Destiny and Eddie who were standing in front of the house, turned at a stop sign, and then parked. The occupants of the truck ran toward the house. Silva, who was carrying a baseball bat, had a look of "[p]ure hatred." *Id.* at 107. Angel warned Eddie, "I wouldn't go in there if

I were you." *Id.* at 120. Sensing trouble, Destiny begged Silva "please don't do it" and "stop," but Silva kept going. *Id.* at 97. One of the men with Silva prevented Destiny from returning to the house. *Id.*

A drunk Elizabeth made it to the door first and shouted "Who the fuc* is Chris?" as she opened the door and entered the house uninvited. *Id.* at 133. Silva then "barged" into house with his baseball bat and yelled, "Who's fuc*ing my daughter?" *Id.* at 134, 139. Jacob quickly replied "no one." *Id.* at 134. Nevertheless Silva swung his bat at Jacob and Michael. Someone then identified Christopher, who was sitting on a crate and had his back turned to the situation. Silva hit Christopher, who never saw the bat coming. People heard "bone crunching." *Id.* Christopher was knocked unconsciousness by the first blow. The rest of the occupants of the house were backed into the kitchen by Alfred and Angel's boyfriend and were told not to help Christopher. Silva hit Christopher with his bat at least four more times.

Jacob ran out of the back of the house and called 911. Elizabeth entered the kitchen and attempted to engage in a confrontation with Tamara. One of the intruders then yelled that the police were coming, at which point the intruders left. Police arrived within minutes. Destiny received text messages from Angel telling her not to be a snitch and that Silva would take care of her if she did not snitch.

Christopher died from his injuries on May 28, 2011. The cause of his death was blunt force trauma to the head.

The State charged Silva with murder. The State later alleged that Silva was a habitual offender. A jury trial was held, during which Silva testified that he acted in self-

3

defense. Specifically, Silva testified that he was trying to get Elizabeth off the front porch because she had no right to go in the house when a fight erupted:

> [T]here were fellows beside the porch that was asking what the hell was going on and they came up on the porch so there was no way out, the only way out was in. That's when we all got pushed in the house. So I couldn't retreat, so that's when everybody went in and that's when I see Christopher Deaton was standing there and he was pointing some gang signs or something. I didn't know the man was deaf and dumb, I didn't know. . . I didn't know anybody. And he pulls a knife and I put my arm up in defense because he was coming, slashing at me. I went like this, he slashed my arm and I punched him. And that's when another man, I believe it was that Jacob Kole, I don't know, comes at me with a bat. I fight with him, I get the bat away from him and that's when I'm swinging at air and it just got out of control. Swinging at everybody trying to get them away from me. I'm being hit in the head with bottles, it was . . . and I just . . . Angel comes in and points who he was. I just, I blacked out, I don't [know] what happened. It got very out of control.

*Id.* at 268-69 (ellipses in original). Silva admitted hitting Christopher in the head with the bat more than once. Silva admitted into evidence two photographs, Defendant's Exhibits A and B, which were taken from an interview of him on a local television station on May 26, 2011, where he claimed to have injuries from Christopher. *Id.* at 270. Angel testified that she told her father that evening that Christopher had inappropriate sexual contact with her, they went over to the house, Christopher came after her father with a knife, and her father hit Christopher with a bat once. *Id.* at 234, 240, 241.

The jury found Silva guilty of murder. The habitual-offender phase of trial was held, and the jury found Silva to be a habitual offender. The trial court sentenced Silva to sixty-five years for murder, enhanced by thirty years for being a habitual offender.

Silva now appeals his murder conviction.

**Discussion and Decision**

Silva contends that the State failed to rebut his claim of self-defense. The standard of review for a challenge to the sufficiency of evidence to rebut a claim of self-defense is the same as the standard for any sufficiency-of-the-evidence claim. *Wilson v. State*, 770 N.E.2d 799, 801 (Ind. 2002). We neither reweigh the evidence nor judge the credibility of witnesses. *Id.* If there is sufficient evidence of probative value to support the conclusion of the trier of fact, then the verdict will not be disturbed. *Id.*

A valid claim of self-defense is legal justification for an otherwise criminal act. *Coleman v. State*, 946 N.E.2d 1160, 1165 (Ind. 2011).

> A person is justified in using reasonable force against any other person to protect the person or a third person from what the person reasonably believes to be the imminent use of unlawful force. However, a person:
>
> > (1) is justified in using deadly force; and
> > (2) does not have a duty to retreat;
>
> if the person reasonably believes that that force is necessary to prevent serious bodily injury to the person or a third person or the commission of a forcible felony. No person in this state shall be placed in legal jeopardy of any kind whatsoever for protecting the person or a third person by reasonable means necessary.

Ind. Code § 35-41-3-2(c). In order to prevail on a claim of self-defense, a defendant must show: (1) he was in a place where he had a right to be; (2) he acted without fault; and (3) he had a reasonable fear of death or great bodily harm. *Coleman*, 946 N.E.2d at 1165. Once a defendant claims self-defense, the State bears the burden of disproving at least one of these elements beyond a reasonable doubt for the defendant's claim to fail. *Miller v. State*, 720 N.E.2d 696, 700 (Ind. 1999). The State may meet this burden by rebutting the defense directly, by affirmatively showing the defendant did not act in self-defense, or by simply relying upon the sufficiency of its evidence in chief. *Id.* Whether the State

5

has met its burden is a question of fact for the fact-finder. *Id.* Self-defense is generally unavailable to a defendant who is the initial aggressor. *Id.*; *see also* I.C. § 35-41-3-2(g)(3).

While the State is required to rebut only a single element of a defendant's self-defense claim, here the State has rebutted every single element of Silva's self-defense claim. The evidence shows that Silva was not in a place where he had the right to be. Silva invaded a residence where he was not invited to enter, yelled at the residents, and swung his baseball bat at Jacob and Michael. Silva then hit Christopher in the head with the bat several times. Contrary to Silva's claim that he was pulled into the house after an altercation on the front porch, several witnesses testified that Silva entered the house shortly after Elizabeth without any provocation. The only physical altercation occurred inside the house, and Silva was the lone aggressor. Angel told her father several different stories about how she had been accosted, touched, raped, molested, or held in the house by Christopher. Tr. p. 265. The evidence most favorable to the verdict shows that Silva entered the house at 420 Bass Street uninvited and of his own volition in order to seek vengeance for his daughter. The State showed beyond a reasonable doubt that Silva was not in a place where he had the right to be.

The State also showed that Silva was at fault for Christopher's death. While Silva claims that he was pulled into the house and was being attacked, the occupants of the house testified that Silva barged into the house, demanded to know who was having sex with his daughter, and attacked an unaware Christopher in the head with his bat, knocking him unconscious with the first blow. Silva did not act without fault.

6

Finally, the State proved that Silva did not have a reasonable fear of death or great bodily harm. Again, Silva presented his own testimony and two photographs, Defendants' Exhibits A and B, as evidence that he was under a reasonable fear of death or great bodily harm. Witnesses testified, however, that Silva was the lone aggressor and that members of Silva's party pushed the occupants of the house into the kitchen so that Silva could continue to attack Christopher. Witnesses observed Silva repeatedly hit Christopher with the bat even after Christopher was rendered unconscious by the first blow. The jury was shown photographs of the grave injuries Christopher sustained and heard medical testimony detailing these injuries. The jury could compare these photographs to the photographs Silva presented of the injuries he claims to have suffered.[1] The reasonable inference is that Silva was not acting out of fear for his own safety or the safety of others but was instead attacking Christopher when Christopher posed no threat to Silva or others. Even Elizabeth, who Silva claims to have been protecting, Appellant's Br. p. 11, did not claim her safety was in jeopardy at trial. Instead, Angel told her father several different stories about how she had been accosted, touched, raped, molested, or held in the house by Christopher. Tr. p. 265. The reasonable inference is that Silva attacked Christopher out of vengeance for what he thought Christopher may have done to his daughter rather than out of self-defense or defense of a third party. We conclude that the evidence is sufficient to rebut Silva's self-defense claim.

---

[1] As for Silva's claim of injuries, when Detective Robert Hollo from the Fort Wayne Police Department had contact with Silva on May 25, which was the day after the incident, he did not notice any injuries to Silva. But when Detective Hollo arrested Silva on June 1, Silva was wearing an ankle brace, a wrist brace, and an elbow brace and told Detective Hollo he was "in pain" and that it was "self defense." Tr. p. 230.

Affirmed.

BAILEY, J., and BROWN, J.,  concur.