## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Mar 11 2019, 7:42 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Jeffrey E. Kimmell
South Bend, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Justin F. Roebel
Deputy Attorney General
Indianapolis, Indiana

## IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Joseph Allan Wilkins, <br> *Appellant-Defendant,* <br><br> v. <br><br> State of Indiana, <br> *Appellee-Plaintiff* | March 11, 2019 <br><br> Court of Appeals Case No. 18A-CR-2367 <br><br> Appeal from the St. Joseph Superior Court <br><br> The Honorable Jenny Pitts-Manier, Judge <br><br> Trial Court Cause No. 71D05-1712-CM-5009 |

**Vaidik, Chief Judge.**

# Case Summary

[1] Joseph Allan Wilkins was convicted of Class A misdemeanor domestic battery and Class A misdemeanor resisting law enforcement. He now appeals, arguing that the evidence is insufficient to support his convictions. We affirm.

# Facts and Procedural History

[2] The evidence most favorable to the verdicts follows. In December 2017, Wilkins and his wife, Debra, had been married for nearly twenty-five years and lived together in Granger. On the afternoon of December 16, Wilkins wanted to seal the garage floor to stop a leak into their basement theater room. He wanted to finish the project before the kids came home from college and asked Debra, who was watching television, to move her car out of the garage. Debra told Wilkins that she would move her car later or that the kids could move it when they got home. Wilkins, who had lost his key to Debra's car, did not want to wait, so he asked Debra for her key so that he could move the car himself. The key was in Debra's purse, which she was holding. When Debra said she would not give him the key, Wilkins "physically t[ook]" Debra's purse from her. Tr. pp. 118, 134. Debra did not want Wilkins to have her purse because her recently deceased father's estate papers were in it. Angry, Debra tried to get her purse back from Wilkins, and a struggle ensued. During the struggle, Debra reached for her purse but instead "caught" Wilkins's beard, pulling out some of his beard hair. *Id.* at 54. This angered Wilkins. Afraid that Wilkins was going to hurt her, Debra retreated into the hallway, but Wilkins

followed her. Wilkins then grabbed Debra's right wrist (Debra did not have mobility in her left arm due a stroke several years before), and the two of them ended up on the floor. Wilkins straddled Debra and held her right wrist to the floor, telling her that he would let go when she "settled down." *Id.* at 61. Wilkins finally got off Debra when she agreed to go to "marriage counseling of his choice." *Id.* at 57.

[3] After Wilkins got off Debra, he moved her car out of the garage and began working on the garage floor. Debra, who was still inside the house, called 911, but she hung up. When the dispatcher called back, Debra reported the incident.

[4] When the police arrived at the house, Wilkins was working in the garage. The first officer on the scene, St. Joseph County Police Department Officer Diana Bauer, spoke to Wilkins in the garage for a few minutes until Debra "appeared in the house-to-garage door." *Id.* at 28. When the second officer, Officer Daniel Yeager, arrived on the scene, Officer Bauer went inside the house and spoke with Debra, who appeared "upset" and "pretty shaken up." *Id.* Debra complained of pain to her right wrist, and Officer Bauer noticed "some red marks." *Id.* at 29. Debra told Officer Bauer that she and Wilkins got into a "dispute . . . over a purse that he had taken and she didn't want him to have." *Id.* at 31.

[5] Meanwhile in the garage, Wilkins told Officer Yeager that Debra had pulled out some of his beard hair and swung at him and that he had held her down until she was calm. Wilkins also told Officer Yeager that he "wanted to press

charges" against Debra. *Id.* at 83. After a short time, Officer Bauer returned to the garage and asked Wilkins for the purse, and Wilkins said the purse was in his truck.

[6] Wilkins and Officer Yeager then walked to Wilkins's truck, and Wilkins retrieved Debra's purse. When Officer Yeager asked for the purse, Wilkins forcefully handed it to him, like a "chest pass." *Id.* at 71. Officer Yeager then instructed Wilkins to walk back to where they had been standing in the garage, and Officer Yeager followed him. About halfway there, Wilkins stopped, "started to talk loudly about [the police] not helping things," and "start[ed] to ball up his fists." *Id.* at 75. At this point, Officer Yeager instructed Wilkins to put his hands behind his back so that he could be detained for officer-safety reasons. *Id.* When Officer Yeager put Debra's purse on top of a trash can in the garage so that he could handcuff Wilkins, Wilkins "went to go grab the purse and started yelling about not [putting] the purse on top of his trash can." *Id.* In response, Officer Yeager put the purse on the garage floor, grabbed Wilkins by the arm, "turned him around," and "put him against" a cabinet in the garage. *Id.* at 76. Wilkins, however, tried to pull his arm away from Officer Yeager and "tens[ed] his arms," preventing the officer from handcuffing him. *Id.* at 78. At about the same time, a third officer, Officer Nicholas Johnson, arrived on the scene and tried to "guide [Wilkins's] arms behind his back," but Wilkins "jerked away from" him. *Id.* at 100. After the officers ordered Wilkins to put his arms behind his back and Wilkins still did not comply, Officer Johnson used a "leg sweep" to take Wilkins to the ground. *Id.* at 86. While on

the ground, Wilkins "was still trying to keep [one of his arms] underneath him." *Id.* at 79, 91. Officer Johnson then "used a distraction technique called a hammer fist directly to [Wilkins's] back," which enabled him to handcuff Wilkins. *Id.* at 103.

[7] The State charged Wilkins with Class A misdemeanor domestic battery and Class A misdemeanor resisting law enforcement. At trial, Wilkins raised claims of self-defense and excessive police force. *Id.* at 162-63. The jury found Wilkins guilty as charged, and he now appeals.

# Discussion and Decision

[8] Wilkins first argues that the State failed to present sufficient evidence to rebut his claim that he committed the domestic battery in self-defense. The standard of review for a challenge to the sufficiency of the evidence to rebut a claim of self-defense is the same as the standard for any sufficiency-of-the-evidence claim. *Cole v. State*, 28 N.E.3d 1126, 1136-37 (Ind. Ct. App. 2015). We neither reweigh the evidence nor judge the credibility of witnesses. *Id.* at 1137. Additionally, if there is sufficient evidence of probative value to support the conclusion of the trier of fact, then the verdict will not be disturbed. *Id.*

[9] Indiana Code section 35-41-3-2(c) provides that "[a] person is justified in using reasonable force against any other person to protect the person or a third person from what the person reasonably believes to be the imminent use of unlawful force." A valid claim of self-defense is legal justification for an otherwise

criminal act. *Coleman v. State,* 946 N.E.2d 1160, 1165 (Ind. 2011). In order to prevail on a claim of self-defense, Wilkins was required to show that he (1) acted without fault; (2) was in a place where he had a right to be; and (3) had a reasonable fear or apprehension of bodily harm. *Henson v. State*, 786 N.E.2d 274, 277 (Ind. 2003). Once a defendant claims self-defense, the State bears the burden of disproving at least one of these elements beyond a reasonable doubt for the defendant's claim to fail. *Miller v. State,* 720 N.E.2d 696, 700 (Ind. 1999).

[10] On appeal, Wilkins asserts that he "acted without fault as he took reasonable, non-violent measures to persuade Debra to move her car for him." Appellant's Br. p. 11. But that is not what the evidence shows. Rather, the evidence shows that Debra, who was holding her purse and did not want Wilkins to have it, told Wilkins that she would not move her car or give him her key. In response, Wilkins took the purse from Debra, causing a struggle for the purse to ensue. Evidence that Wilkins took the purse from Debra against her will allowed the jury to find that Wilkins did not act without fault. Accordingly, the State presented sufficient evidence to rebut Wilkins's claim of self-defense.

[11] Wilkins next argues that the evidence is insufficient to support his conviction for resisting law enforcement because Officer Johnson used excessive force in employing the leg sweep. The premise of Wilkins's argument, however, is that he fully cooperated with the police up to the point of the leg sweep and **only** resisted when Officer Johnson "slammed [him] to the concrete." *Id.* at 12. The evidence shows that Wilkins also resisted **before** the leg sweep. That is,

when Wilkins and Officer Yeager were walking back from Wilkins's truck, Wilkins stopped, "started to talk loudly about [the police] not helping things," and "start[ed] to ball up his fists." Tr. p. 75. At this point, Officer Yeager instructed Wilkins to put his hands behind his back so that he could be detained for officer-safety reasons. Instead of complying, Wilkins reached for Debra's purse. Officer Yeager then grabbed Wilkins by the arm, "turned him around," and "put him against" a cabinet in the garage. *Id.* at 76. Wilkins still did not comply. Instead, he tried to pull his arm away from Officer Yeager and "tens[ed] his arms," preventing the officer from handcuffing him. *Id.* at 78. These actions, which occurred before Officer Johnson used the leg sweep, are sufficient to sustain Wilkins's conviction for resisting law enforcement.

[12] Affirmed.

Mathias, J., and Crone, J., concur.