**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



ATTORNEY FOR APPELLANT:

**SUSAN D. RAYL**
Smith Rayl Law Office, LLC
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**CYNTHIA L. PLOUGHE**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

EDWARD LAY,                                )
                                           )
    Appellant-Defendant,               )
                                           )
        vs.                        )    No. 49A05-1208-CR-387
                                           )
STATE OF INDIANA,                          )
                                           )
    Appellee-Plaintiff.                )

APPEAL FROM THE MARION SUPERIOR COURT
The Honorable Sheila A. Carlisle, Judge
Cause No. 49G03-1108-MR-057160

**April 30, 2013**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**VAIDIK, Judge**

**Case Summary**

Following a night of drinking tequila, Edward Lay shot and killed two women, including his girlfriend, and shot and injured his best friend. Lay now appeals his convictions for two counts of murder and one count of attempted murder and his resulting 140-year sentence. He contends that the trial court erred in how it responded to a jury question during deliberations, the evidence is insufficient to sustain his convictions, and his sentence is inappropriate. Finding no error in how the court handled the jury question, that the evidence is sufficient to sustain Lay's convictions, and that Lay has failed to persuade us that this 140-year sentence is inappropriate, we affirm.

**Facts and Procedural History**

The facts most favorable to the verdicts follow. In August 2011, Lay, estranged from his wife, was dating Mary Swift. Lay had recently moved into Mary's Fountain Square home in Indianapolis, in which Mary's nine-year-old daughter Alley,[1] Mary's twenty-year-old daughter Brittany Swift, Brittany's one-year-old son, and Brittany's boyfriend Joshua Edenfield also lived.

On the evening of Thursday, August 11, 2011, Lay's longtime friend Ron Kortz and his fiancée Kelly Jinks went to Mary's house to celebrate their new home and Ron's acceptance back into college. Ron and Kelly arrived around 8:00 p.m. with a bottle of Patron tequila. They went to Mary and Lay's bedroom, which was the normal place to "hang out." Brittany joined the party while Josh was at work. After the Patron tequila was gone, Lay and Ron went to a friend's house to get more tequila. After the second

---

[1] There is a discrepancy in the record regarding the spelling of her name, either Alley or Allie. Because both parties use Alley, so do we.

2

bottle of tequila was gone, Ron went with Josh, who had just returned home from work, to the liquor store and bought two bottles of Bambitos tequila. Josh did not drink any alcohol that night.

Sometime during the night, nine-year-old Alley was awakened by Lynyrd Skynyrd's "Sweet Home Alabama" coming from the bedroom. She went downstairs to complain because she had school in the morning. Mary and Brittany asked Lay to turn down the music, but he refused. An argument ensued, and Mary and Brittany told Lay to leave. Lay refused, calling Mary and Brittany "fuc*ing bit**es," "who*es," and "cun*s who "couldn't tell him what to do." Tr. p. 160. A shoving match ensued between Mary and Brittany and Lay. As Mary and Brittany inched Lay out the door, he grabbed a black bag that was inside a box. At the time, no one knew what was inside the black bag.

The arguing continued in the kitchen and then spilled out onto the back porch, where Lay continued to yell that Mary and Brittany could not make him leave. Brittany responded that Lay was being "disrespectful" and "need[ed] to go for the night" but "c[ould] come back tomorrow." *Id.* at 161. Lay responded, "Well I got my 40, bit**." *Id.* Lay then backed down the ramp from the back porch toward the area where the cars were parked. Josh tried to calm Lay down; however, Lay put a gun to Josh's face and said something that Josh could not understand. Josh swatted the gun away, saying, "Hey, I'm not down here to fight." *Id.* at 256. Lay turned around and went to the passenger side of Kelly's car, where Ron and Kelly tried to get him inside.

The situation did not diffuse; rather, it escalated. Lay began threatening Brittany, so she swung at him and missed. Lay then hit Brittany in the face four or five times,

3

which prompted her mother Mary to join the melee. Ron pulled Brittany away and brought her to where Josh was standing at the bottom of the ramp. Josh tried to corral Mary and bring her back toward the house, but he failed. Josh managed to move Brittany farther up the ramp as Mary yelled at Lay and hit him in retribution for hitting her daughter.

As Josh turned back toward the cars, he heard three or four gunshots that happened "so fast" and then saw Lay running away. *Id.* at 259. He also saw Ron asking Kelly if she had been hit. Brittany, however, saw Lay push Mary down to her hands and knees, point the gun at her from behind, and then she heard gun shots. Brittany did not see Lay pull the trigger because she fell through a loose board on the ramp. Brittany ran to her mother. When Brittany realized her mother was not able to talk, she ran back to her sister, Alley, who was screaming on the back porch. Lay shot Mary, Kelly, and Ron. Josh called 911 to report the shootings.

Ron suffered a gunshot wound to his right shoulder. According to Ron, Lay shot him as he confronted Lay for shooting Kelly. Ron took a few steps and collapsed in the alley by Kelly. When Ron landed, he saw Mary on the ground near the car.

Ron was taken to the hospital where he underwent surgery and was released a week later. He now has no feeling in his right arm and cannot hold a coffee cup in his right hand.

Mary and Kelly, however, suffered fatal wounds. Mary was dead when emergency personnel arrived. Mary suffered a gunshot wound to the top of her head. The bullet traveled downward and exited the right side of her forehead, lacerating her

4

brain and fracturing her skull.  Kelly was taken to the hospital but was pronounced dead a couple hours later.  Kelly suffered a gunshot wound to her chest and left buttock.  The gunshot wound to Kelly's chest perforated her diaphragm and lacerated her liver, causing blood accumulation in her right chest cavity.  The other gunshot wound traveled across Kelly's pelvic cavity and landed in her right hip.  Kelly died as a result of blood loss from both gunshot wounds.

The police apprehended Lay within a few blocks of the scene.  Four spent shell casings were found at the scene.

The State charged Lay with the murders of Mary and Kelly and the attempted murder of Ron.  A two-day jury trial was held in June 2012, during which Lay argued self-defense.  The jury was also instructed on transferred intent.[2]  During deliberations, the jury sent the following note to the trial court: "If we are unclear as to the defendant's intention, does transferred intent apply?"  *Id.* at 387, 388.  The court told the parties that it thought it was appropriate to give each side five minutes to respond to the jury's question.  *Id.* at 388.  The court asked the parties if they were comfortable with that solution.  The State said yes, and defense counsel said, "I'm comfortable with that.  I'd rather have them reread the instruction, but I know that's not what they're allowed to do

---

[2] The jury was instructed as follows:

> Under the doctrine of transferred intent, the intent to harm one person may be treated as the intent to harm a different person when, through mistake or inadvertence, violence directed toward[] one person results in injury to a different person.
> In a situation where there is an intent to kill one person, but a different person suffers the injury and dies, the intent to kill the first person may serve as proof of the intent to kill the actual victim.

Appellant's App. p. 207 (Instruction No. 28).  Lay does not challenge this instruction on appeal.

5

anymore." *Id.* The court told defense counsel that she could reread the instruction if she wanted.

The court then brought the jury back out to the courtroom and encouraged the jurors to reread all the instructions. *Id.* at 389. The prosecutor and defense counsel then briefly argued transferred intent as it related to Kelly. The jury resumed deliberations. Approximately four hours later, the jury returned with verdicts of guilty as charged on each of the three charges. *Id.* at 396.

Following the sentencing hearing, the trial court found Lay's mental-health issues and expression of remorse to be mitigating but declined to find undue hardship to Lay's children to be mitigating because he could not remember the names and birthdates of some of his children. The court found the following aggravators: Lay committed the crime in the presence or within hearing of an individual less than eighteen years old; the nature and circumstances of the crime; there were multiple victims; Lay's criminal history—which included misdemeanor domestic battery, felony battery resulting in bodily injury, felony criminal recklessness, and misdemeanor resisting law enforcement, and Lay's prior opportunities to rehabilitate. Concluding that the aggravators outweighed the mitigators, the trial court sentenced Lay to the advisory term on each count—fifty-five years for each murder conviction and thirty years for attempted murder—and ordered the sentences to be served consecutively, for an aggregate term of 140 years.

Lay now appeals.

## Discussion and Decision

Lay raises multiple issues, which we condense, rephrase, and reorder as follows. First, he contends that the trial court committed fundamental error by allowing the parties to make additional argument to the jury in response to the jury's question about transferred intent during deliberations. Second, he contends that the evidence is insufficient to sustain his convictions. Last, he contends that his 140-year sentence is inappropriate.

## I. Jury Question about Transferred Intent

Lay contends that the trial court erred by allowing the parties to make additional argument to the jury in response to the jury's question about transferred intent during deliberations.

The record shows that during deliberations at 8:50 p.m., the jury sent the following note to the trial court: "If we are unclear as to the defendant's intention, does transferred intent apply?" *Id.* at 387, 388. The trial court told the parties that it thought it was appropriate to give each side five minutes to respond to the jury's question unless anyone had a better suggestion. *Id.* at 387. The court said that it would give each side time to prepare, to which defense counsel said, "I would love that." *Id.* The court asked the parties if they were comfortable with that solution. The State said yes, and defense counsel said, "I'm comfortable with that. I'd rather have them reread the instruction, but I know that's not what they're allowed to do anymore." *Id.* at 388. The court told defense counsel that she could reread the instruction if she wanted.

7

The court brought the jury back in and encouraged the jurors to reread all the instructions. *Id.* at 389. The State then made its argument, appearing to use most of its allotted time. *Id.* at 389-393. Defense counsel, however, made only a two-paragraph argument. *See id.* at 393 ("There is no evidence that [Lay] intended to kill Kelly. None. . . . If you are not sure, you cannot convict. And it's beyond a reasonable doubt of what his intent was. Our position is that transferred intent does not apply if there is any uncertainty as to the defendant's intention.").

The jury resumed deliberations at 9:20 p.m. but had another question at 10:50 p.m.: "What are the consequences if we are not at a unanimous decision on one count, and also can we have a break?" *Id.* at 394-95. After consultation with the parties, the trial court responded, "Would further deliberations assist you in reaching a unanimous decision?" *Id.* at 395. The court heard nothing further from the jury until 1:01 a.m., when the jury found Lay guilty as charged on all three counts. *Id.* at 394-96.

Because Lay did not object to the trial court's procedure of giving each side five minutes to respond to the jury's question about transferred intent, he argues fundamental error on appeal. Failure to object at trial waives the issue for review unless fundamental error occurred. *Hoglund v. State*, 962 N.E.2d 1230, 1239 (Ind. 2012), *reh'g denied*. The fundamental-error doctrine provides a vehicle for the review of error not properly preserved for appeal. *Id.* In order to be fundamental, the error must represent a blatant violation of basic principles rendering the trial unfair to the defendant and thereby depriving the defendant of fundamental due process. *Id.* Harm is not shown by the fact

that the defendant was ultimately convicted; rather, harm is found when the error is so prejudicial as to make a fair trial impossible. *Id.*

Trial courts are required to respond to jury inquiries "as to any point of law arising in the case." Ind. Code § 34-36-1-6. In addition, Indiana Jury Rule 28 urges trial judges to facilitate and assist jurors in the deliberative process in order to avoid mistrials. Under appropriate circumstances, and with advance consultation with the parties and an opportunity to voice objections, a trial court may directly seek further information or clarification from the jury regarding its concerns, directly answer the jury's question (either with or without directing the jury to reread the other instructions), allow counsel to briefly address the jury's question in short supplemental arguments to the jury, or employ other approaches or a combination thereof. *Tincher v. Davidson*, 762 N.E.2d 1221, 1224 (Ind. 2002). Before the adoption of Jury Rule 28, a trial court was required to reread all instructions in response to a jury question. *Henri v. Curto*, 908 N.E.2d 196, 205 (Ind. 2009). But with the adoption of Jury Rule 28, the Indiana Supreme Court intended to encourage trial judges to fashion creative, resourceful, and sensible responses to individualized case circumstances to assist jurors confronted with apparent impasse. *Id.*

In light of this policy, Lay cannot show error, fundamental or otherwise. Jury Rule 28 provides considerable discretion to the trial court in how a jury question should be resolved. And our Supreme Court has acknowledged that permitting supplemental arguments by the parties is one such method of resolving a jury question. Not only did defense counsel not object to the court's procedure, but she said she was "comfortable"

9

with it. *See Booher v. State*, 773 N.E.2d 814, 822 (Ind. 2002) ("A party may not invite error, then later argue that the error supports reversal, because error invited by the complaining party is not reversible error." (quotation omitted)). Accordingly, the trial court did not err by allowing the parties to make additional argument to the jury in response to the jury's question about transferred intent during deliberations.

## II. Sufficiency of the Evidence

Next, Lay contends that the evidence is insufficient to sustain his conviction for the murder of Kelly and that the State failed to rebut his claim of self-defense. The standards of review for these sufficiency challenges are the same. *Wilson v. State*, 770 N.E.2d 799, 801 (Ind. 2002). When reviewing a challenge to the sufficiency of the evidence underlying a criminal conviction, we neither reweigh the evidence nor assess the credibility of witnesses. *Bailey v. State*, 979 N.E.2d 133, 135 (Ind. 2012). The evidence—even if conflicting—and all reasonable inferences drawn from it are viewed in a light most favorable to the conviction. *Id.* "[W]e affirm if there is substantial evidence of probative value supporting each element of the crime from which a reasonable trier of fact could have found the defendant guilty beyond a reasonable doubt." *Id.*

### A. Transferred Intent Regarding Kelly

Lay contends that the evidence is insufficient to sustain his conviction for the murder of Kelly. Lay argues that there is no evidence that he knowingly or intentionally killed Kelly, which Indiana Code section 35-42-1-1 requires, because there "was no reason for [him] to intentionally shoot her" and she "was no more than a bystander to the argument between" him, Mary, and Brittany. Appellant's Br. p. 16. The State argues

10

that even if Lay did not intend to kill Kelly, his conviction can be upheld under the doctrine of transferred intent.

Under the doctrine of transferred intent, a defendant's intent to kill one person is transferred when, by mistake or inadvertence, the defendant kills a third person; the defendant may be found guilty of the murder of the person who was killed, even though the defendant intended to kill another. *Blanche v. State*, 690 N.E.2d 709, 712 (Ind. 1998). In other words, if the evidence shows the requisite mental state to exist in conjunction with the performance of a criminal act, then the law may punish the perpetrator, although the particular person injured was a mere bystander. *Straub v. State*, 567 N.E.2d 87, 91 (Ind. 1991).

Here, the evidence shows that Lay had a heated and ongoing confrontation with Mary and Brittany. The three of them argued inside the house, where they were shoving one another. The argument then spilled outside, where Lay hit Brittany. This upset Mary, who joined the ruckus. Ron was able to pull Brittany away and pass her off to Josh. Brittany then saw Lay push Mary down to her hands and knees, point the gun at her from behind, and then she heard gun shots. Josh, the only sober person of the group, heard three or four gunshots happen "so fast" that he could not tell if there were pauses in between. Tr. p. 259. He then saw Ron ask Kelly if she had been hit. When Ron confronted Lay for shooting Kelly, Lay shot Ron in the shoulder. In the end, Mary was shot in the head. Kelly was shot twice—in the chest and left buttock.[3] And Ron was shot in the shoulder. Four spent shell casings were found at the scene. Based on this

_____

[3] Ron testified at trial that when he approached Kelly, she was bleeding from her abdomen. He believed that the bullet that passed through his right shoulder struck Kelly, causing the second wound to her left buttock. Tr. p. 70.

evidence, the jury could infer that Lay shot at or through Mary or Ron and the bullets struck Kelly, a mere bystander, causing her fatal injuries.[4]  Accordingly, the evidence is sufficient to support Lay's conviction for the murder of Kelly based on the doctrine of transferred intent.

### B. Self-Defense

Lay contends that the State failed to rebut his claim of self-defense.  A valid claim of self-defense is legal justification for an otherwise criminal act.  *Coleman v. State*, 946 N.E.2d 1160, 1165 (Ind. 2011).

> A person is justified in using reasonable force against any other person to protect the person or a third person from what the person reasonably believes to be the imminent use of unlawful force.  However, a person:
> (1) is justified in using deadly force; and
> (2) does not have a duty to retreat;
> if the person reasonably believes that that force is necessary to prevent serious bodily injury to the person or a third person or the commission of a forcible felony.  No person in this state shall be placed in legal jeopardy of any kind whatsoever for protecting the person or a third person by reasonable means necessary.

Ind. Code § 35-41-3-2(c).  In order to prevail on a claim of self-defense, a defendant must show: (1) he was in a place where he had a right to be; (2) he acted without fault; and (3) he had a reasonable fear of death or great bodily harm.  *Coleman*, 946 N.E.2d at 1165.  Once a defendant claims self-defense, the State bears the burden of disproving at least one of these elements beyond a reasonable doubt for the defendant's claim to fail.  *Miller v. State*, 720 N.E.2d 696, 700 (Ind. 1999).  The State may meet this burden by rebutting

---

[4] Lay makes several arguments about the order of who was shot and how that could impact the doctrine of transferred intent.  For example, Lay argues that if Mary was shot and killed first, "There can be no transferred intent to do something that has already been done."  Appellant's Reply Br. p. 5. However, Lay's arguments are merely requests for us to reweigh the evidence, which we will not do.  The evidence before the jury was that Lay fired four shots very quickly, in the dark, and then fled without seeing the outcome of his shots.  Lay could have fired more than one shot at Mary or Ron, striking Kelly.

the defense directly, by affirmatively showing the defendant did not act in self-defense, or by simply relying upon the sufficiency of its evidence in chief. *Id.* Whether the State has met its burden is a question of fact for the fact-finder. *Id.* Self-defense is generally unavailable to a defendant who is the initial aggressor. *Id.*; *see also* I.C. § 35-41-3-2(g)(3).

We find that the State has rebutted two elements of Lay's self-defense claim—that Lay did not act without fault and was not in reasonable fear of death or great bodily harm. The evidence shows that it was Lay who brandished the gun and fired the shots at the victims, none of whom had guns. The altercation that led to the murders and the attempted murder began when Lay, after a night of drinking tequila, refused to turn down the music so that a nine-year-old child could sleep because she had school in the morning. When Mary and Brittany told Lay to leave, he refused. A shoving match ensued, and the group ended up on the back porch. Brittany continued to yell at Lay to leave, at which point he responded, "Well I got my 40, bit**." Tr. p. 160. When Josh, the only sober one, tried to convince Lay to leave, Lay pointed the gun in Josh's face. This shows that Lay was not someone who was acting innocently or peaceably; rather, he was aggravating an already tense and volatile situation.

Moreover, the evidence does not show that Lay was in reasonable fear of death or great bodily harm. There is no evidence that either Mary or Brittany was armed with anything other than their hands. There was mutual shoving inside the house. At the time of the shooting, Brittany was on the ramp, away from Lay. There was evidence that Mary approached Lay and hit him in retribution for his hitting her daughter. But there is

13

no evidence indicating where she hit him or even how hard. Regardless, nothing reveals that any of Mary's hits placed Lay in fear of death or great bodily harm. At most, this was a fist fight between Lay and an unarmed woman to which Lay introduced a gun. And Lay ended the fist fight by pushing Mary down to her hands and knees and shooting her in the head from behind, shooting Kelly in the chest and buttock, and shooting Ron in the shoulder when he confronted him for shooting Kelly. The amount of force that a person may use to protect himself depends on the urgency of the situation. *Mateo v. State*, 981 N.E.2d 59, 72 (Ind. Ct. App. 2012), *trans. denied*. If a person uses more force than is reasonably necessary under the circumstances, his self-defense claim will fail. *Id.* Because Lay used more force than was necessary under the circumstances, the evidence is sufficient to rebut his self-defense claim.

### III. Inappropriate Sentence

Finally, Lay contends that his 140-year sentence is inappropriate in light of the nature of the offenses and his character. He therefore asks us to "resentence [him] to mitigated sentences of forty-five years on each count of murder, twenty years on attempted murder, and order that the sentence[s] be served concurrently." Appellant's Br. p. 14.

Our rules authorize revision of a sentence "if, after due consideration of the trial court's decision, the Court finds that the sentence is inappropriate in light of the nature of the offense and the character of the offender." Ind. Appellate Rule 7(B). "[A] defendant must persuade the appellate court that his or her sentence has met this inappropriateness standard of review." *Childress v. State*, 848 N.E.2d 1073, 1080 (Ind. 2006).

The principal role of Rule 7(B) review "should be to attempt to leaven the outliers, and identify some guiding principles for trial courts and those charged with improvement of the sentencing statutes, but not to achieve a perceived 'correct' result in each case." *Cardwell v. State*, 895 N.E.2d 1219, 1225 (Ind. 2008). Whether a sentence is inappropriate ultimately turns on the culpability of the defendant, the severity of the crime, the damage done to others, and a myriad of other factors that come to light in a given case. *Id.* at 1224.

A person who commits murder shall be imprisoned for a fixed term of between forty-five and sixty-five years, with the advisory sentence being fifty-five years. Ind. Code § 35-50-2-3. A person who commits a Class A felony shall be imprisoned for a fixed term of between twenty and fifty years, with the advisory sentence being thirty years. Here, the trial court sentenced Lay to the advisory term of fifty-five years for each murder conviction and the advisory term of thirty years for his Class A felony attempted murder conviction and ordered the sentences to be served consecutively, for an aggregate term of 140 years.

In the words of the trial court, "[t]his whole event started because of a little girl [who] was trying to go to sleep, and [Lay] wouldn't let her." Tr. p. 485-86. Instead, Lay engaged in a verbal argument, which quickly morphed into a physical one and left two unarmed women, including his own girlfriend, dead and a man described as his "brother" permanently injured. The trial court struggled to come up with a reason for the senselessness of this violence. *See id.* at 477 ("And I think everyone involved, as well as the Court, would like to pinpoint some explanation And the fact is, there's very little to

15

pinpoint other than perhaps you drank too much that night, and the alcohol helped fuel your anger to a point where you reacted violently."). And even Lay describes the offenses as "kill[ing] two people and sh[ooting] another in a drunken argument." Appellant's Br. p. 29. The fact that Lay may not have planned to kill or injure anyone when the evening began does not lessen the seriousness of the offenses. The nature of the offenses alone supports Lay's 140-year sentence.

Lay's character also supports his 140-year sentence. He has a rather lengthy criminal history. In 1997, Lay was convicted of misdemeanor operating a vehicle while intoxicated, and in 1999, he was convicted of felony auto theft. In 2001, Lay was convicted of two counts of misdemeanor driving while license suspended. In 2002, Lay was convicted of misdemeanor domestic battery, and in 2004, Lay was convicted of two counts of felony battery resulting in bodily injury. In 2007, Lay was convicted of misdemeanor resisting law enforcement and felony criminal recklessness. Finally, in 2011, Lay was convicted of misdemeanor resisting law enforcement. Lay has served time in jail, in the Department of Correction, on community corrections with a mental-health component, and on probation seven times. He has had his probation revoked several times. As the trial court observed, Lay "ha[s] a history of violence on other people" and has had "many opportunities to rehabilitate [him]self along the way," which he did not take advantage of. Tr. p. 482-83.

Although there is evidence in the record that Lay has had some mental-health issues, the trial court did not find them significant and more importantly did not find them to be the explanation for the murders and the attempted murder. *Id.* at 478.

16

Given the senseless nature of the offenses and Lay's character, we conclude that Lay has failed to persuade us that his 140-year sentence is inappropriate.

Affirmed.

BAILEY, J., and BROWN, J., concur.