## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

May 26 2017, 5:38 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Stacy R. Uliana
Bargersville, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Ian McLean
Supervising Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| David Hagan,<br>*Appellant-Defendant*,<br><br>v.<br><br>State of Indiana,<br>*Appellee-Plaintiff*. | May 26, 2017<br><br>Court of Appeals Case No.<br>92A05-1607-CR-1587<br><br>Appeal from the Whitley Circuit Court<br><br>The Honorable James R. Heuer, Judge<br><br>Trial Court Cause No.<br>92C01-1511-MR-90 |

**Brown, Judge.**

[1] David Hagan appeals his conviction and sentence for reckless homicide as a level 5 felony. He raises two issues which we revise and restate as:

I. Whether the prosecutor committed misconduct during closing argument which resulted in fundamental error; and

II. Whether his sentence is inappropriate in light of the nature of the offense and the character of the offender.

We affirm.

## *Facts and Procedural History*

[2] Hagan lived with his longtime girlfriend Vonda Kelsey in his house in South Whitley, Indiana. Around April 2015, Lisa Bowers, who lived with her five children and Adam Porter, whom she dated, met Kelsey. At some point while Porter was present, Bowers "made a noise about [her] back or something," and Kelsey offered her a Percocet. Transcript Volume I at 36-37. Bowers told her no and that Kelsey needed her medication, but Kelsey said it was okay and gave her a Percocet. Another time, Kelsey gave either Porter or Bowers another pill after Bowers asked for one.

[3] On July 18, 2015, Porter texted Kelsey and asked: "Do you have a few goodies I can get?" Transcript Volume II at 9. Later that day, he texted Kelsey: "P-P-P-Please" with three exclamation points. *Id.* at 10. That same evening, he texted her "I love you," "Is that a no," "Just text me and let me know," "sad," "me," and "Vondaaaaa." *Id.* at 10-11. Porter also sent text messages to Kelsey on July 19, 26, and 31, and August 12, without a response. In July 2015, there

were "a lot of calls from" Kelsey to Bowers and Porter until July 25, and the next phone call did not take place until August 12. *Id.* at 14.

[4]     At some point, Bowers and Porter went to Hagan's residence, and Bowers spoke with Hagan. On August 2, 2015, Hagan posted the following update to Facebook:

> Apparently my reputation for being an asshole isn't as well know [sic] as I thought it was, long story follows. A couple of months ago my g.f. found a couple of new "friends". I was kind of suspicious of them from the start because they're about 20 years younger than us, and I don't trust anyone that I haven't known personally for at least 10 years. I'm getting a bit ahead of myself here, let me take a moment to point out that g.f. ruptured a disc in her neck that required surgery and still has to take some pretty potent pain meds twice a day to cope. That said, I noticed that new "friends" had a habit of showing up on Fridays wanting to see her, sometimes several times a night. She noticed that too and informed me that they're always trying to talk her into giving them some of her meds, which she refused to do. Those meds are potent enough that she's subject to being randomly called into the hospital for a pill count to ensure that she's not abusing or selling them. Well, if you've been paying attention to my posts you'll know about the week I had and that on Friday I was stressed, sick of other people's bullshit, wanted a quiet evening and numerous ice cold vodka & tonics to unwind. That didn't happen. New friends showed up looking for g.f., several times. The last time I noticed that one went to the back door while the other went to the front door and knocked. [R]ecognizing the diversion tactic I put on my pea shooter and answered the front door. After listening to the woman at the door repeatedly demand that I tell her where g.f. was, and after several cold vodka and tonics I was at the top of my game, I proceeded to unload with some of my finest assholery ever. The funny part is that once I got started that woman kept saying "we care about

her". Yeah, right. Spare me, you care so much that you'd jeopardize her access to the meds she need [sic] to cope for your own personal gain. I might not be that old but I wasn't born yesterday and I don't have a problem with a reputation for being an asshole. I don't think they'll be back again.

State's Exhibit 124A.

[5] On August 14, 2015, Hagan was drinking vodka and water. Bowers and Porter were drinking beer and stopped at Hagan's house with Bowers's five-year-old child. Porter knocked on the side door, Kelsey yelled that she was out back, and Porter and the child walked to the backyard. Kelsey and Porter conversed for a few minutes. Hagan then exited the back door and started walking toward them while holding a gun down by his side. Kelsey said: "Adam, he's got a gun." Transcript Volume II at 48. Porter charged Hagan, they struggled with each other, and Hagan shot Porter in the head. The child was in the backyard when the shooting occurred.

[6] Hagan called 911, requested police, and stated that he had shot Porter. He stated: "He attacked . . . he charged me, attacked me, threw me to the ground, and I turned the gun in defense and shot." Transcript Volume I at 101. South Whitley Police Officer Andrew J. Westerman arrived at the scene, observed that Hagan was calm, smelled the odor of an alcoholic beverage on Hagan's breath, and took him into custody. Porter died as a result of a gunshot wound to the back of his head. Police discovered a revolver near Porter's body and an injury on Porter's hand. Later examination of the revolver indicated that it was

single action meaning that "you have to cock, manually cock, the hammer of the firearm." *Id.* at 211. Police recovered one bullet fragment.

[7] Indiana State Police Detective Andrew Mills went to the hospital where Hagan had been taken to check his level of intoxication. The blood test revealed that Hagan's blood alcohol was .15. Detective Mills then spoke with Hagan at the Whitley County Sheriff's Department and took photographs of him. Detective Mills observed that Hagan was calm, pleasant to deal with, and cooperative.

[8] Dr. Scott Wagner performed an autopsy on Porter which revealed that the bullet traveled from the knot on the back of Porter's head to the top of his head. He also discovered some superficial scrapes on the base of Porter's thumb, some very superficial scrapes at the base of the knuckles, and "a little bit of bruising at the base of the wrist." *Id.* at 193. Dr. Wagner observed a loose contact wound indicating that the gun was either right up against Porter's head or very close when it was fired. A toxicology test on Porter's blood revealed 69.4 nanograms of amphetamine per milliliter, 32.1 nanograms of alprazolam per milliliter, and 0.246 ethanol.

[9] On November 20, 2015, a grand jury indicted Hagan for murder and reckless homicide as a level 5 felony. On December 21, 2015, Hagan filed a notice of self-defense.

[10] On May 10, 11, 12, and 13, 2016, the court held a jury trial. Bowers testified that she believed Hagan hit Kelsey because she always had marks on her face, bruises, and busted lips, and she always cried over nothing. Bowers testified

that about two weeks prior to the shooting, she knocked on the door of Kelsey's home while Porter waited in her vehicle, Hagan came to the door and was very rude, and he told her that Kelsey was out running around. She stated that a cat ran into the house, Hagan went to slam the door on her, and she yelled: "Vonda, I know you're in there. Can you please call or text us just to let us know you're okay." *Id.* at 40. She also testified that Hagan did not ever tell her not to come back to his home.

[11] With respect to the day of the shooting, Bowers testified that about two or three minutes elapsed between the time Porter and her son went into Kelsey's backyard before her son came running to her saying that Porter was hurt. She testified that she told Kelsey to call 911 and that Kelsey said: "What am I gonna do? Who's gonna take care of me? How am I gonna pay my bills? What am I gonna do?" *Id.* at 56. On cross-examination, Hagan's counsel asked Bowers if it was true that she and Porter went to Kelsey's house that night to obtain prescription pills, and Bowers answered: "No. That's ludicrous." *Id.* at 72.

[12] Kelsey testified that Hagan never raised a hand to her, that Bowers and Porter started "hounding" her, and that Porter would ask her if he "could get some pills" and she told him no. Transcript Volume II at 29. She also testified that Porter always asked for the pills while Bowers sat in her vehicle. She stated that when Porter texted her asking for "goodies" that he was talking about pills. *Id.* at 30. She stated that she told Hagan "what was going on and they were hounding me" and that "[e]very time I turned around, they was at the door and

. . . [Porter] was at the door wanting pills. And, I kept telling him, no, I can't." *Id.* at 31. Kelsey testified that she was across the street watching from her neighbor's on the occasion when Porter went to the side door and Bowers went to the front door. She saw Porter and Bowers looking for her and did not let them know where she was located because she "didn't want them bugging me. I mean, enough was enough." *Id.* at 38.

[13] Kelsey also testified that after she told Porter that Hagan had a gun, Porter "charged at [Hagan] big time," "[k]nocked him on the ground hard," and they scuffled for probably one or two minutes. *Id.* at 52. She stated that Hagan was on top of Porter and she thought Porter was on his back at the time the gun was fired. When asked if Hagan was on top of Porter when the shot rang out, she answered: "I don't know." *Id.* at 56. She also testified that she might have told Hagan: "you just ruined your life." *Id.* at 59. On cross-examination, she testified that Hagan and Porter were rolling on the ground when the shot was fired.

[14] During cross-examination of Sheila Arnold, a forensic toxicologist and quality control coordinator at the Indiana State Department of Toxicology, Hagan's counsel asked: "Would it be fair to say that Adam Porter, who had a .253, um, blood alcohol level, a 32.1 nanograms per milliliter of alprazolam, as well as 69.4 nanograms per liter of amphetamine, would be extremely impaired?" Transcript Volume I at 248. Arnold answered affirmatively.

[15] Danielle Trout, Kelsey's daughter-in-law, testified that, at some point prior to Porter's death and after what Hagan thought was an attempted burglary of his residence, Hagan said: "if [Porter] comes back, I'm going to shoot him." Transcript Volume II at 104. She also testified that she initially told the police that she did not hear "anything of any sort," but then called the police to confess that she did hear the statement the weekend before. *Id.* at 106. Michelle Wakefield, Kelsey's youngest daughter, testified that Hagan never said that he was going to shoot Porter if Porter returned and that it would be unusual for Hagan to make that statement.

[16] Lydia Hyden testified that she lived across the street from Hagan and Kelsey, that she heard two gunshots maybe a second apart, and that she saw Hagan standing up when she heard them. She also testified that she asked Kelsey what happened and Kelsey said: "well, last weekend he said, if he then come . . . if [Porter] come [sic] to our house again, he gonna shoot his ass, and I can't believe that he did this." *Id.* at 134. Bill Hyden, Lydia's husband, testified that he heard two gunshots. He testified that Lydia had previously said that Kelsey did not want to go home at one point because Porter and Bowers were there for her prescription pills.

[17] Hagan testified that he found out that Porter and Bowers were trying to acquire Percocets from Kelsey. He described the visit from Porter and Bowers in which Bowers went to the front door and Porter went to the side door. He stated: "I found that disturbing because, uh, you hear about, in the news, these type of burglaries happening where they're distracting you at the front door and

somebody is coming in the back door." Transcript Volume III at 64. He testified that he answered the front door, Bowers asked if Kelsey was there, he told her no, Bowers repeatedly demanded that he tell her where Kelsey was, he told her that he was not going to tolerate someone showing up at his door and treating him with the third degree, a stray cat ran into the house, he told Bowers that "she and [Porter] need to get the f--- off of my property and not come back," and he closed the door. *Id.* at 67.

[18] Hagan testified that on August 14, 2015, he saw Porter in his backyard with Kelsey and observed that Porter had a beer can in one hand and "seemed to be agitated, animated" and "was waving his arms around in the air." *Id.* at 73. He testified he was concerned for Kelsey's safety, he "made the decision that [he] was gonna run [Porter] off the property, ask him to leave," he felt he should have some sort of protection with him because Porter appeared agitated so he picked up his revolver, loaded it, and walked across the backyard to approach Porter. *Id.* at 74. He stated that he pointed the gun straight down at the ground, walked at a normal pace, did not wave the gun around, and did not threaten anyone. He testified that Porter turned, charged him, hit him hard, and knocked him out of his sandals and to the ground. He testified that when he hit the ground he flinched and the gun went off, Porter and him wrestled on the ground, he ended up pinned underneath Porter, he felt a hand on his forearm and thought Porter was trying to take the gun from him, he was scared, he "reached over the top of me and I fired the gun," and he "had no idea where I was firing the gun." *Id.* at 77. When asked why he fired the gun and did not

aim it at anything, Hagan answered: "I figured that, if the gun went . . . if he heard the gun firing over the top of him, that might scare him enough to get up and . . . and get away from me, run away." *Id.* at 78.

[19] On cross-examination, Hagan testified that in response to a comment from one of his Facebook friends, he indicated "that crew had no idea who they were f----- with." *Id.* at 90. He testified he did not recall ever saying that if Porter returned that he was going to shoot him. He also testified that he did not call the police initially because he felt there was an imminent threat to Kelsey. When asked if he agreed it was a mistake in judgment after hearing what Kelsey had to say regarding what was actually occurring in the backyard, Hagan answered: "Yeah. I suppose so." *Id.* at 101. He also testified that he did not see the five-year-old child until Porter was dead.

[20] During closing argument, the prosecutor stated:

> A person who recklessly kills another human being and it's reckless homicide, a level 5 felony. Was it reckless behavior that led David Hagan to kill Adam Porter? We know about the intoxication. We know about taking no more time than it takes you to tie your shoes, less time maybe, to make a determination. We know that he, himself, under recross . . . or, redirect examination from his attorney, said he was missing critical facts when he made the judgment about whether to go into that backyard.

*Id.* at 160.

[21] Defense counsel argued:

The last instruction says, a person engages in conduct recklessly if he engages in the conduct in plain conscious and unjustifiable disregard of harm that might result and the disregard involves a substantial deviation from acceptable standards of conduct. And, I guess I'm argue [sic] to you that, when [Hagan] looks out the kitchen window and sees this madman flailing his arms, who's not supposed to be on the property, that getting his gun and just quietly, slowly walking normally out of his house in his own backyard, is reckless. Are you kidding me? That's an unjustifiable disregard of the harm that might result and the disregard involves a substantial deviation from acceptable standards of conduct.

\* \* \* \* \*

Instruction Number 10. It's one of the important ones to really start with. It says, it is the policy of the State of Indiana to recognize the unique character of a citizen's home and to ensure that a citizen . . . citizen feels secure in his or her own home against unlawful intrusion by another individual. [Porter] intruded, especially after being told not to come back in two weeks. And, [Bowers] did, too. The next sentence, it is the policy of this state that people have a right to defend his house, his curtilage from criminal trespassers. And, [Hagan] had the right to defend [Kelsey], who he thought would . . . may get attacked by a crazy, doped-up man. Instruction Number 11. This is the self-defense. This is the justification for the fourth verdict. This is why you should choose the fourth verdict, which is justifiable homicide. And, it is not a crime. Not all homicides are crimes. A person is justified in using reasonable force against any other person to protect the person or a third person from what the person reasonably believes to be the imminent use of unlawful force. Is this reasonable force? Just having a gun at your side and walking out in your backyard? Is that unreasonable? However, a person is justified in using deadly force and does not have to retreat. If the person reasonably

believes that force is necessary to prevent serious bodily injury to the person or a third person. It goes on. Or the commission of a forceful felony. No person in this state shall be placed in legal jeopardy of any kind whatsoever for protecting the person or third person by reasonable means necessary. Is going out with a gun on your side reasonable? Yes. But, once [Hagan] is attacked, once he's attacked viciously, and is on his back and then the guy is trying to get his gun, [Hagan] is justified in defending himself. . . . Would [Hagan] be justified in going out there and just going, boom? No. But, once . . . once attacked and on the ground and they're fighting to take your gun, yeah. Yeah. Now, notwithstanding what I've read to you above, a person is not justified in using force if the person provokes unlawful action by the other person with the intent to cause bodily injury to the other person or the person has entered into combat with another person or is the initial aggressor. [Hagan] didn't provoke anything. This was provoked by [Porter] coming, committing a criminal trespass with his girlfriend . . . committing a criminal trespass, all hopped up drugs [sic] and alcohol, and then charged him. [Porter] was the one who provoked. . . . The State has the burden of proving beyond a reasonable doubt that Mr. Hagan did not act in self-defense.

*Id.* at 173-176.

[22] In rebuttal, the prosecutor stated:

You have four questions you've got to answer. Four questions. The way I see it, the first question is, is what David Hagan did murder or manslaughter under the law? We talked in jury selection about murder and about reckless homicide. Now, we didn't talk about manslaughter. But, as things sometimes happen, we have to wait 'til the evidence comes in. . . . We know what murder is. It's knowingly or intentionally killing another human being. Uh, we'll talk in a second about what manslaughter is. The second question you have to answer is,

does self-defense . . . uh, does that excuse Mr., uh, Hagan's commission of murder or manslaughter? And, you'll have the instruction that we've already talked about on self-defense. The third question you have decide [sic], even if not guilty of murder or manslaughter . . . even if self defense applies to there, is reckless homicide an appropriate charge? And, the fourth question, how is self-defense apply to reckless homicide? Those are the four questions that you should ask yourself as jurors in the jury room.

*Id.* at 178. The prosecutor later stated:

If you decide that murder or manslaughter are not appropriate charges, or if you decide that self-defense excuses murder or manslaughter, talk about reckless homicide. Because the . . . the analysis is completely different. The charge is completely different and self-defense is completely different. And, I'll explain to you how. Reckless homicide, BAC, blood alcohol level, .15. And please, please, please as jurors, do not take what witnesses tell you from the witness stand at face value. Witnesses lie all the time. I can tell you that a hundred percent. Okay? Some of the State's witnesses, some of the Defendant's witnesses. Sometimes, the Defendant lies, believe it or not. And, if you believe, uh, that Mr. Hagan had three drinks which got him to .15, uh, I've got some land I want to sell you. That ain't true. No one gets a .15, uh, unless they're drinking tall coolers of vodka. Three of them. And, it stretches credibility, uh, to . . . uh, to say that he was .15 at nine-thirty, but at eight-thirty, he was only .05. How does that work? And, you can have an expert who's willing to say things that . . . that stretch credibility, uh, if they get paid enough. And, that's what happened here today. Twice the legal limit to drive. I certainly wouldn't want him . . . want him behind the wheel of his Mustang. We asked the State's toxicologist, uh, when is intoxication dangerous. Well, it's when someone gets behind the wheel or behind a weapon. I think that's a great answer. I had no idea that was

gonna be her answer, but it's a really good one and it applies to this case. It applies to reckless homicide. Approaching a pill-popping drug addict with a deadly weapon when you're not in control of your faculties. Is that the definition of reckless behavior? Absolutely it is. Creating a volatile situation where something bad is possibly gonna happen, probably gonna happen. Absolutely reckless. And, [Hagan] either overestimated his ability to control the situation, I asked him about this. Did you think you could control the situation with a gun? Well, yeah, I did. So, he either overestimated his ability to do that or he had little care for whether he could control the situation at all. It doesn't matter to me. I'm going out there with a gun 'cause I'm in control of the situation. Reckless homicide also requires that the action be a substantial deviation from acceptable standards of conduct. Employing a weapon and . . . employing a weapon unnecessarily, again, despite all the other options he had. Calling the police, warning, telling [Kelsey] to come in. A whole range of things he could have done. Unloaded gun. He said he employed the weapon and his blood alcohol level was .15. With power comes responsibility. With weaponry comes responsibility. Call the police. And, call the police two weeks ago when there's an attempted burglary going down or after the fact so they're aware of what's happened, at the very least. And, certainly, when he comes back to your backyard, call the police. Now, I want to talk briefly . . . I want . . . I want to talk about how self-defense applies to reckless homicide 'cause it's a different analysis. Uh, the analysis I think with murder and manslaughter is you want to know, when he pulls that trigger, is it necessary then. That's when he's committing a murder. That's when the action turns into consequence. With reckless homicide, it's a whole different time frame. When did he commit the crime? Well, did he commit the crime when he, uh, saw [Porter] and loaded the gun and walked out the door and was .15? Is that the reckless behavior that led to the death? Yes. So, we ask, at that time frame, uh, was, uh, force reasonably necessary to prevent serious bodily injury? Was he employing, uh, that force, uh, because it was necessary or because he wanted to be in

control?  He wanted to be the big man. . . .  The blood alcohol reading is very important to the reckless homicide charge and self-defense.  Handling this situation this way was completely unnecessary.  It was not necessary.  It was completely unnecessary.  Call the police.  Call [Kelsey] into the house.

*Id.* at 183-185.

[23]  The court instructed the jury with respect to self-defense, the right to bear arms, murder, voluntary manslaughter, and reckless homicide.  The jury found Hagan guilty of reckless homicide as a level 5 felony.  The court found Hagan's criminal record, his history of alcohol abuse, and the fact that he committed a crime of violence in the presence of a child five years of age as aggravating factors and found no mitigating circumstances.  On June 13, 2016, the court sentenced Hagan to four years incarceration.

## *Discussion*

### I.

[24]  The first issue is whether the prosecutor committed misconduct during closing argument which resulted in fundamental error.  In reviewing a properly preserved claim of prosecutorial misconduct, we determine: (1) whether the prosecutor engaged in misconduct, and if so, (2) whether the misconduct, under all of the circumstances, placed the defendant in a position of grave peril to which he should not have been subjected.  *Cooper v. State*, 854 N.E.2d 831, 835 (Ind. 2006).  Whether a prosecutor's argument constitutes misconduct is measured by reference to caselaw and the Rules of Professional Conduct.  *Id.*

The gravity of peril is measured by the probable persuasive effect of the misconduct on the jury's decision rather than the degree of impropriety of the conduct. *Id.*

When an improper argument is alleged to have been made, the correct procedure is to request the trial court to admonish the jury. *Id.* If the party is not satisfied with the admonishment, then he should move for mistrial. *Id.* Failure to request an admonishment or to move for mistrial results in waiver. *Id.*

As acknowledged by Hagan, he did not object to the prosecutor's statements. To circumvent waiver, Hagan contends that the statements resulted in fundamental error. Where, as here, a claim of prosecutorial misconduct has not been properly preserved, our standard of review is different from that of a properly preserved claim. *Id.* More specifically, the defendant must establish not only the grounds for the misconduct, but also the additional grounds for fundamental error. *Id.* Fundamental error is an extremely narrow exception that allows a defendant to avoid waiver of an issue. *Cooper*, 854 N.E.2d at 835. It is error that makes "a fair trial impossible or constitute[s] clearly blatant violations of basic and elementary principles of due process . . . present[ing] an undeniable and substantial potential for harm." *Id.* "This exception is available only in 'egregious circumstances.'" *Brown v. State*, 929 N.E.2d 204, 207 (Ind. 2010) (quoting *Brown v. State*, 799 N.E.2d 1064, 1068 (Ind. 2003)), *reh'g denied*. "Fundamental error is meant to permit appellate courts a means to correct the most egregious and blatant trial errors that otherwise would have been

procedurally barred, not to provide a second bite at the apple for defense counsel who ignorantly, carelessly, or strategically fail to preserve an error." *Ryan v. State*, 9 N.E.3d 663, 668 (Ind. 2014), *reh'g denied*.

[27] Hagan contends that the prosecutor's arguments that self-defense applied differently to reckless homicide than to voluntary manslaughter and murder and that the jury could convict him of reckless homicide even if he acted in self-defense were misstatements of law. He argues that self-defense should apply equally and consistently to both murder and reckless homicide, and that, if he was acting in self-defense at the time of the shooting, he was acting in self-defense for all three charges. He argues that the prosecutor's statements were relevant to the task of evaluating self-defense and that the jury could have determined, as encouraged by the prosecutor, that he was justified by self-defense in the shooting because Porter attacked him while on his property, but that Hagan was reckless in the first place for displaying the gun. He states that the instructions were silent as to whether Hagan could be found to have acted in self-defense for murder and voluntary manslaughter, but not reckless homicide and that his claim of self-defense was strong. The State contends that Hagan failed to show misconduct, let alone fundamental error.

[28] Generally, a valid claim of self-defense is legal justification for an otherwise criminal act. *Coleman v. State*, 946 N.E.2d 1160, 1165 (Ind. 2011) (citing *Randolph v. State*, 755 N.E.2d 572, 575 (Ind. 2001)). Ind. Code § 35-41-3-2 governs self-defense and provides:

(a) In enacting this section, the general assembly finds and declares that it is the policy of this state to recognize the unique character of a citizen's home and to ensure that a citizen feels secure in his or her own home against unlawful intrusion by another individual or a public servant. By reaffirming the long standing right of a citizen to protect his or her home against unlawful intrusion, however, the general assembly does not intend to diminish in any way the other robust self defense rights that citizens of this state have always enjoyed. Accordingly, the general assembly also finds and declares that it is the policy of this state that people have a right to defend themselves and third parties from physical harm and crime. The purpose of this section is to provide the citizens of this state with a lawful means of carrying out this policy.

* * * * *

(c) A person is justified in using reasonable force against any other person to protect the person or a third person from what the person reasonably believes to be the imminent use of unlawful force. However, a person:

    (1) is justified in using deadly force; and

    (2) does not have a duty to retreat;

if the person reasonably believes that that force is necessary to prevent serious bodily injury to the person or a third person or the commission of a forcible felony. No person in this state shall be placed in legal jeopardy of any kind whatsoever for protecting the person or a third person by reasonable means necessary.

(d) A person:

(1) is justified in using reasonable force, including deadly force, against any other person; and

(2) does not have a duty to retreat;

if the person reasonably believes that the force is necessary to prevent or terminate the other person's unlawful entry of or attack on the person's dwelling, curtilage, or occupied motor vehicle.

\* \* \* \* \*

(g) Notwithstanding subsections (c) through (e), a person is not justified in using force if:

(1) the person is committing or is escaping after the commission of a crime;

(2) the person provokes unlawful action by another person with intent to cause bodily injury to the other person; or

(3) the person has entered into combat with another person or is the initial aggressor unless the person withdraws from the encounter and communicates to the other person the intent to do so and the other person nevertheless continues or threatens to continue unlawful action.

[29]    Reckless homicide is an inherently included lesser offense of murder, as the only element distinguishing the two is the requisite culpability. *See Fisher v. State*, 810 N.E.2d 674, 679 (Ind. 2004); *Miller v. State*, 720 N.E.2d 696, 702 (Ind. 1999). The offense of reckless homicide is governed by Ind. Code § 35-42-1-5,

which provides: "A person who recklessly kills another human being commits reckless homicide, a Level 5 felony." "A person engages in conduct 'recklessly' if he engages in the conduct in plain, conscious, and unjustifiable disregard of harm that might result and the disregard involves a substantial deviation from acceptable standards of conduct." Ind. Code § 35-41-2-2.

[30] The court instructed the jury regarding reckless homicide as follows:

> The crime of Reckless Homicide is defined by statute as follows: A person recklessly kills another human being commits Reckless Homicide, a Level 5 Felony. Before you may convict the Defendant, the State must have proved each of the following beyond a reasonable doubt: Number 1, the Defendant; Number 2, recklessly; Number 3, killed; Number 4, Adam W. Porter. If the State failed to prove each of these elements beyond a reasonable doubt, you must find the Defendant not guilty of Reckless Homicide, Level 5 Felony, charged in Count II.

Transcript Volume III at 190.

[31] The court instructed the jury with respect to the right to bear arms and self-defense as follows:

> Under the Constitution of the State of . . . uh, under the Indiana Constitution, uh people shall have the right to bear arms for the defense of themselves and the State. Under the Second Amendment of the United States Constitution, a well regulated militia, being necessary to the security of a free state, the right of people to keep and bear arms shall not be infringed. The evidence was received that Mr. Hagan owns firearms. The people of the State of Indiana have the constitutional rights to keep and bear arms for lawful purposes, which includes personal safety. You are not to hold anything against or convict Mr.

[Hagan] simply because he lawfully possessed a firearm. The policy . . . it is the policy of the State of Indiana to recognize the unique character of a citizen's home and to ensure that the citizen feels secure in his or her home against unlawful intrusion by another. It is the policy of this State that a person have a right to defend themselves and third parties from physical harm and crime. A person is justified in using reasonable force against another person to protect the person or a third person from what the person reasonably believes to be an imminent use of unlawful force. However, a person: 1, is justified in using deadly force and does not have to . . . a duty to retreat if the person reasonably believes that the force is necessary to prevent serious bodily injury to the person or a third person or the commission of a forcible felony. No person in this state shall be placed in legal jeopardy of any kind whatsoever for protecting the person or a third person by reasonable means . . . by reasonable means necessary, excuse me. A person is justified in using reasonable force, including deadly force, against any other person and does not have the duty to retreat if the person reasonably believes that force is necessary to prevent or terminate the other person's unlawful entry of or attack on the person's dwelling, curtilage, or occupied motor vehicle. Notwithstanding the subsections stated above, a person is not justified in using force if the person provokes unlawful action by the other person with intent to . . . to cause bodily injury to the other person or the person has entered into combat with the other person or is the initial aggressor. The State has the burden of proving beyond a reasonable doubt that Mr. Hagan did not act in self-defense.

*Id.* at 190-191. The court also instructed:

Arguments, statements, and remarks of counsel were intended to help you in understanding the evidence and applying the law, but were not evidence. If any argument, statement, or remark had no basis in the evidence, then you should disregard that argument, statement, or remark.

*Id.* at 193.

[32] The record reveals that the trial court provided thorough instructions with respect to murder, voluntary manslaughter, reckless homicide, the right to bear arms, and self-defense. We also note that while the prosecutor stated that the analysis of self-defense was different, he did not expressly state that self-defense did not apply to reckless homicide. Under the circumstances, we cannot say that Hagan has demonstrated fundamental error.[1]

## II.

[33] The next issue is whether Hagan's sentence is inappropriate in light of the nature of the offense and his character. Ind. Appellate Rule 7(B) provides that we "may revise a sentence authorized by statute if, after due consideration of the trial court's decision, [we find] that the sentence is inappropriate in light of the nature of the offense and the character of the offender." Under this rule, the

---

[1] To the extent Hagan relies upon *Burnside v. State*, we observe that the instruction at issue in that case stated as follows:

> If you find beyond a reasonable doubt that the State did prove beyond a reasonable doubt the existence of the four essential elements of the charge of murder, and you also find that the Defendant was acting in self-defense, and that he used deadly force, but you find that in his use of deadly force, the Defendant was acting recklessly, that is, that the Defendant was acting in plain, conscious, and unjustifiable disregard of harm that might result and that the disregard involved a substantial deviation from acceptable standards of conduct, you may find the Defendant guilty of reckless homicide, a Class C felony.

858 N.E.2d 232, 240 (Ind. Ct. App. 2006). The *Burnside* court concluded that this instruction informed the jury incorrectly that self-defense is a precondition to a reckless homicide verdict. *Id.* However, no similar instruction was given to the jury here. Accordingly, we do not find *Burnside* instructive.

burden is on the defendant to persuade the appellate court that his or her sentence is inappropriate. *Childress v. State*, 848 N.E.2d 1073, 1080 (Ind. 2006).

[34] Hagan argues that he acted in self-defense, he did not realize that the child was on the property, and that Porter knew he was not welcome on the property. He states that his only convictions were for two non-violent misdemeanors, one when he was nineteen years old in 1983 and another in 1996, and that he held the same job for fourteen years and lived with the same woman for twenty-five years. He also argues that he is a low risk to re-offend and is remorseful and asks that his sentence be revised to the advisory sentence of three years with the last year served on home detention.

[35] The State argues that Hagan's sentence is not inappropriate and asserts that Hagan consumed a significant amount of vodka and then chose to begin an armed confrontation with Porter in a way more suggestive of an attempt to surprise and gain an advantage than of Hagan's self-professed claim that he wanted to keep the situation calm. The State also points to Hagan's prior convictions involving marijuana and alcohol.

[36] Ind. Code § 35-50-2-6 provides that "[a] person who commits a Level 5 felony (for a crime committed after June 30, 2014) shall be imprisoned for a fixed term of between one (1) and six (6) years, with the advisory sentence being three (3) years."

[37] Our review of the nature of the offense reveals that Porter became intoxicated, saw Porter in his yard holding a can of beer, loaded his revolver, exited his

house with it, walked across the backyard and approached Porter, struggled with Porter after Porter charged him, fired the gun when he had no idea where he was firing, and killed Porter.

[38] Our review of the character of the offender reveals that the presentence investigation report ("PSI") states that Hagan is a model maker and manufacturing engineer and began working with his employer in July 2001. As a juvenile, Hagan admitted to committing attempted theft. As an adult, he was sentenced for being a minor in possession as a class C misdemeanor in March 1983 and possession of marijuana as a class A misdemeanor in June 1983. In 1996, he was sentenced for operating while intoxicated as a class A misdemeanor. The PSI states that Hagan's risk assessment score using the Indiana risk assessment system places him in the low risk to reoffend category.

[39] In a letter, Hagan wrote in part:

> I feel grief [and] sympathy for [Porter's] family. The loss of a family member due to natural causes is painful and takes time to heal, the cause behind their loss of [Porter] certainly intensifies their sense of loss and makes the healing process take much longer. The matter of a trial that brought up aspects of [Porter's] life they'd sooner forget has to be like having salt rubbed in their wounds [and] I feel very deep sympathy for them.
>
> I feel sadness for [Porter]. He was only 24 when this happened. His life was just beginning when it ended.
>
> I feel sadness and anger that [Porter and Bowers] were, and are, wrestling with personal demons and nobody is stepping up or

stepped up to intervene. [Porter's] demons contributed to, if not ultimately led to his demise.

I feel anger that both [Porter and Bowers] chose to ignore my wishes that they not return to my property, which their returning ultimately led to the incident. Now I will carry the burden of having taken his life for the remainder of my life.

I feel confusion because there was never any intent to harm [Porter], just to tell him to leave. I was armed for my own [and Kelsey's] protection. Why did he attack me? I'll never know. If he hadn't done that he'd have just been told to, leave and allowed to safely leave the property.

I also feel anger toward the judicial system of Whitley County for failing to help [Porter] when it had several chances.

Appellant's Appendix Volume III at 17.

[40] After due consideration, we conclude that Hagan has not sustained his burden of establishing that his sentence of four years is inappropriate in light of the nature of the offense and his character.

### *Conclusion*

[41] For the foregoing reasons, we affirm Hagan's conviction and sentence.

[42] Affirmed.

Vaidik, C.J., and Bradford, J., concur.